## No. 21-1042

# In the
# United States Court of Appeals
# for the Seventh Circuit

JOSEPH BROWN, et al.,

*Plaintiffs-Appellants,*

v.

JEFFREY L. KEMP, et al.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Western District of Wisconsin, No. 3:17-cv-00549-wmc.
The Honorable **William M. Conley**, Judge Presiding.

## BRIEF AND SHORT APPENDIX OF PLAINTIFFS-APPELLANTS
## JOSEPH BROWN, LOUIS WEISBERG and STEPHANIE LOSSE

MARK M. LEITNER
JOSEPH S. GOODE (*Counsel of Record*)
JESSICA L. FARLEY
LAFFEY, LEITNER & GOODE, LLC
325 East Chicago Street
Suite 200
Milwaukee, Wisconsin 53202
(414) 312-7003

KELSEY R. EBERLY
CHRISTOPHER BERRY
ANIMAL LEGAL DEFENSE FUND
525 East Cotati Avenue
Cotati, California 94931
(707) 795-2533

*Counsel for Appellants*

 

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>21-1042</u>

Short Caption: <u>Joseph Brown, et al. v. Jeffrey L. Kemp, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Joseph Brown; Louis Weisberg; Stephanie Losse</u>

 

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Laffey, Leitner & Goode, LLC</u>

<u>Animal Legal Defense Fund (through duly admitted in-house counsel)</u>

(3)      If the party, amicus or intervenor is a corporation:

     i)      Identify all its parent corporations, if any; and

     ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: <u>/s/ Mark M. Leitner</u>      Date: <u>1-13-21</u>

Attorney's Printed Name:  <u>Mark M. Leitner</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐   **No** ☑

Address: <u>325 E. Chicago St., Suite 200</u>

    <u>Milwaukee, WI 53202</u>

Phone Number: <u>414-312-7003</u>      Fax Number: <u>414-755-7089</u>

E-Mail Address: <u>mleitner@llgmke.com</u>

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-1042

Short Caption: Joseph Brown, et al. v. Jeffrey L. Kemp, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.** The Counsel of Record box is now checked.

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Joseph Brown; Louis Weisberg; Stephanie Losse

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Laffey, Leitner & Goode, LLC

Animal Legal Defense Fund (through duly admitted in-house counsel)

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Joseph S. Goode    Date: 2-16-21

Attorney's Printed Name: Joseph S. Goode

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☑ No ☐

Address: 325 E. Chicago Street, Suite 200

Milwaukee, WI 53202

Phone Number: 414-312-7003    Fax Number: 414-755-7089

E-Mail Address: jgoode@llgmke.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

<div style="text-align:right;">
Save As      Clear Form
</div>

Appellate Court No: 21-1042

Short Caption: Joseph Brown, et al. v. Jeffrey L. Kemp, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

       [ ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Joseph Brown; Louis Weisberg; Stephanie Losse

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Laffey, Leitner & Goode, LLC

Animal Legal Defense Fund (through duly admitted in-house counsel)

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Jessica L. Farley    Date: 1-13-21

Attorney's Printed Name: Jessica L. Farley

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]  No [✔]

Address: 325 E. Chicago St., Suite 200

Milwaukee, WI 53202

Phone Number: 414-312-7003    Fax Number: 414-755-7089

E-Mail Address: jfarley@llgmke.com

<div style="text-align:right;">rev. 12/19 AK</div>

APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 21-1042

Short Caption: Joseph Brown, et al. v. Jeffrey L. Kemp, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

<div style="border:1px solid"> </div> **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Joseph Brown; Louis Weisberg; Stephanie Losse

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Laffey, Leitner & Goode, LLC

Animal Legal Defense Fund (through duly admitted in-house counsel)

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Christopher Berry      Date: 1-13-21

Attorney's Printed Name: Christopher Berry

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]   No [✔]

Address: 525 E. Cotati Ave.

Cotati, CA 94931

Phone Number: 707-795-2533      Fax Number:

E-Mail Address: cberry@aldf.org

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-1042

Short Caption: Joseph Brown, et al. v. Jeffrey L. Kemp, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Joseph Brown; Louis Weisberg; Stephanie Losse

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Laffey, Leitner & Goode, LLC

Animal Legal Defense Fund (through duly admitted in-house counsel)

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Kelsey Eberly      Date: 1-13-21

Attorney's Printed Name: Kelsey Eberly

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).      Yes ☐      No ☑

Address: 525 E. Cotati Ave.

Cotati, CA 94931

Phone Number: 707-795-2533      Fax Number:

E-Mail Address: keberly@aldf.org

rev. 12/19 AK

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS.................................................... i

TABLE OF AUTHORITIES ....................................................................... viii

JURISDICTIONAL STATEMENT ................................................................. 1

    A.    District Court Jurisdiction. ............................................................. 1

    B.    Appellate Jurisdiction. ................................................................... 1

ISSUES PRESENTED ............................................................................... 1

STATEMENT OF THE CASE................................................................... 2

District Court Proceedings ................................................................... 2

Factual Background ............................................................................... 4

SUMMARY OF ARGUMENT ................................................................ 9

ARGUMENT ........................................................................................... 13

Standard of Review................................................................................ 13

    I.    Plaintiffs Have Standing To Challenge The Statute. ............. 13

        A.    Standing Exists When A Statute Has A Chilling Effect On First Amendment Rights............................................................. 13

        B.    Plaintiffs' Protected Activity Falls Within The Scope Of The Statute. ......................................................................... 16

        C.    Plaintiffs Showed A Substantial Threat Of Future Prosecution............................................................................. 21

        D.    Plaintiffs' Injury Is Traceable To The Statute And The Defendants And Would Be Remedied By A Decision In Plaintiffs' Favor. ................................................................... 24

    II.    The Statute Impermissibly Targets Speech Based On Its Content And Its Viewpoint................................................................... 25

        A.    The Statute Targets Protected Speech And Speech-Facilitating Activities................................................................. 26

B. The Statute Is Facially Content-Based. ...................................... 27

C. The Statute Is Viewpoint-Based. ................................................. 31

III. The Statute Cannot Survive Strict Scrutiny........................................ 32

A. The Statute Does Not Serve A Compelling State Interest. ....... 33

B. The Statute Is Not Narrowly Tailored......................................... 34

C. Facial Relief Is Warranted. ........................................................... 36

IV. The Statute Is Unconstitutionally Overbroad. ..................................... 37

V. The Statute Is Unconstitutionally Vague. ............................................ 42

CONCLUSION ........................................................................................................ 45

CERTIFICATE OF COMPLIANCE .................................................................... 47

CIRCUIT RULE 30(d) CERTIFICATE ............................................................... 48

CERTIFICATE OF SERVICE .............................................................................. 49

## TABLE OF AUTHORITIES

CASES                                                                    PAGES

*Am. Civil Liberties Union of Ill. v. Alvarez*
    679 F.3d 583 (7th Cir. 2012) ................................................................ 16, 27, 38

*Animal Legal Defense Fund v. Kelly*
    434 F. Supp. 3d 974 (D. Kan. 2020) ........................................................ 35

*Animal Legal Defense Fund v. Reynolds*
    297 F. Supp. 3d 901 (S.D. Iowa 2018)...................................................... 24

*Animal Legal Defense Fund v. Wasden*
    878 F.3d 1184 (9th Cir. 2018) .................................................................. 27

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*
    564 U.S. 721 (2011) .................................................................................. 32

*Babbitt v. United Farm Workers Nat'l Union*
    442 U.S. 289 (1979) ............................................................................ 15, 19

*Balogh v. Lombardi*
    816 F.3d 536 (8th Cir. 2016) .................................................................... 25

*Bell v. Keating*
    697 F.3d 445 (7th Cir. 2012) ............................................................... 15, 37

*Bennett v. Spear*
    520 U.S. 154 (1997) .................................................................................. 24

*Brandt v. Village of Winnetka*
    612 F.3d 647 (7th Cir. 2010) .................................................................... 15

*Broadrick v. Oklahoma*
    413 U.S. 601 (1973) .................................................................................. 38

*Bronson v. Swensen*
    500 F.3d 1099 (10th Cir. 2007) ................................................................ 25

*Brown v. Entertainment Merchants Ass'n*
    564 U.S. 786 (2011) ........................................................... 26, 33, 34, 42

*Comite de Jornaleros v. City of Redondo Beach*
    657 F.3d 936 (9th Cir. 2011) .................................................................... 36

CASES                                                                    PAGES

*Commodity Trend Serv. v. Commodity Futures Trading Comm'n*
  149 F.3d 679 (7th Cir. 1998) .................................................. 24

*Citizens United v. Federal Election Comm'n*
  558 U.S. 310 (2010) ............................................................... 37

*Ctr. for Individual Freedom v. Madigan*
  697 F.3d 464 (7th Cir. 2012) .................................................. 14

*Doe v. Reed*
  561 U.S. 186 (2010) ............................................................... 37

*Dorman v. Satti*
  862 F.2d 432 (2d Cir. 1988) ................................................... 33

*Ezell v. City of Chicago*
  651 F.3d 684 (7th Cir. 2011) .................................................. 16

*F.C.C. v. League of Women Voters of California*
  468 U.S. 364 (1984) ............................................................... 28

*Forsyth County v. Nationalist Movement*
  505 U.S. 123 (1992) ......................................................... 29, 41

*Greater Rockford Energy & Technology Corp. v. Shell Oil Co.*
  998 F.3d 391 (7th Cir. 1993) .................................................. 13

*Hill v. Colorado*
  530 U.S. 703 (2000) ............................................. 39, 40, 43, 44

*Hodgkins ex rel. Hodgkins v. Peterson*
  355 F.3d 1048 (7th Cir. 2004) ............................................... 39

*Hoover v. Wagner*
  47 F.3d 845 (7th Cir. 1995) .............................................. 19, 20

*Horina v. City of Granite City*
  538 F.3d 624 (7th Cir. 2008) .................................................. 36

*Lawson v. Hill*
  368 F.3d 955 (7th Cir. 2004) .................................................. 21

*Lexmark Int'l Inc. v. Static Control Components*
  572 U.S. 118 (2014) ............................................................... 25

CASES                                                                                            PAGES

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992) .......................................................................... 14

*Majors v. Abell*
    317 F.3d 719 (7th Cir. 2003) ............................................................ 21

*Norton v. City of Springfield*
    806 F.3d 411 (7th Cir. 2015) ...................................................... 28, 29

*Ovadal v. City of Madison*
    416 F.3d 531 (7th Cir. 2005) ...................................................... 29, 30

*People v. Sanders*
    696 N.E.2d 1144 (Ill. 1998) ............................................................. 33

*Perez v. Ladesma*
    401 U.S. 82 (1971) ........................................................................... 25

*Police Dep't of Chicago v. Mosley*
    408 U.S. 92 (1972) ........................................................................... 27

*Reed v. Town of Gilbert*
    576 U.S. 155 (2015) ............................................... 27, 28, 29, 30, 33

*Reno v. Am. Civil Liberties Union*
    521 U.S. 844 (1997) ......................................................................... 43

*Rosenberger v. Rector & Visitors Univ. of Virginia*
    515 U.S. 819 (1995) ......................................................................... 31

*Simon & Schuster, Inc. v. Members of New York State Crimes Victims Bd.*
    502 U.S. 105 (1991) ......................................................................... 37

*Six Star Holdings, LLC v. City of Milwaukee*
    3821 F.3d 795 (7th Cir. 2016) ......................................................... 25

*Sorrell v. IMS Health, Inc.*
    564 U.S. 552 (2011) ......................................................................... 30

*Speech First, Inc. v. Killeen*
    968 F.3d 628 (7th Cir. 2020) ........................................................... 23

*State v. Bagley*
    474 N.W.2d 761 (Wis. Ct. App. 1991) ............................................... 4

CASES                                                                PAGES

*State v. Casey*
    876 P.2d 138 (Idaho 1994)............................................................... 41, 42

*Susan B. Anthony List v. Dreihaus*
    573 U.S. 149 (2014) ............................................... 14, 16, 18, 19, 20

*Turner Broadcasting System, Inc. v. F.C.C.*
    512 U.S. 622 (1994) .......................................................................... 30, 31

*United States v. Alvarez*
    567 U.S 709 (2012) ............................................................................... 33

*United States v. Knotts*
    460 U.S. 276 (1983) .............................................................................. 390

*United States v. McIver*
    186 F.3d 1119 (9th Cir. 1999) ............................................................ 39

*United States v. O'Brien*
    391 U.S. 367 (1968) ....................................................................... 38, 39

*United States v. Oliver*
    466 U.S. 170 (1984) .............................................................................. 39

*United States v. Playboy Entertainment Group, Inc.*
    529 U.S. 803 (2000) ....................................................................... 34, 37

*United States v. Stevens*
    559 U.S. 469 (2010) .............................................................................. 37

*United States v. Thirty-Seven Photographs*
    402 U.S. 363 (1971) .............................................................................. 25

*Virginia v. American Booksellers Ass'n*
    484 U.S. 383 (1988) ....................................................................... 14, 15

*Ward v. Rock Against Racism*
    491 U.S. 781 (1989) ........................................................... 28, 30, 34, 39

*West Virginia Bd. of Ed. v. Barnette*
    319 U.S. 624 (1943) ....................................................................... 10, 31

*Wiesmueller v. Kosobucki*
    571 F.3d 699 (7th Cir. 2010) ............................................................... 15

**STATUTES**                                                                        **PAGES**

28 U.S.C. § 1291 ................................................................................................ 1

28 U.S.C. § 1331 ................................................................................................ 1

28 U.S.C. § 1343(3) ........................................................................................... 1

Wis. Stat. § 29.083 ..................................................................................*passim*

Wis. Stat. § 29.083(2)(a) ........................................................................... 44, 45

Wis. Stat. § 29.083(2)(a)2. ................................................................. 35, 36, 42

Wis. Stat. § 29.083(2)(a)3. .............................................................................. 35, 36

Wis. Stat. § 29.083(2)(a)7. .............................................................................. 42

Wis. Stat. § 29.083(2)(a)7.a ................................................... 8, 27, 36, 37, 43

Wis. Stat. § 29.083(2)(a)7.b ................................................... 8, 27, 36, 37, 43

Wis. Stat. § 29.083(2)(a)7.c .....................................................................*passim*

Wis. Stat. § 29.083(2)(a)7.d ...................................................................... 8, 36, 37

Wis. Stat. § 29.083(2)(b) ................................................................................. 44

Wis. Stat. § 940.32 ......................................................................................... 38

Wis. Stat. § 941.30 ......................................................................................... 38

Wis. Stat. § 947.01 ......................................................................................... 38

Wis. Stat. § 947.013 ....................................................................................... 38

Wis. Stat. § 978.05(1) ................................................................................... 25

Wis. Stat. § 978.05(5) ................................................................................... 25

**OTHER AUTHORITIES**                                                               **PAGES**

Badger Herald, *Wisconsin hosted strong turnout from deer and humans alike
     this hunting season* (Dec. 2, 2015)
     https://badgerherald.com/news/2015/12/02/wisconsin-hosted-strong-turnout-
     from-deer-and-humans-alike-this-hunting-season/ ................................................. 9

**OTHER AUTHORITIES**                                                    **PAGES**

RiverTowns.net, *PETA wants northwestern Wisconsin school to scrap hunting pictures* (Apr. 10, 2008)
  https://www.rivertowns.net/sports/996239-peta-wants-northwestern-wisconsin-school-scrap-hunting-pictures ............................................................. 10

## JURISDICTIONAL STATEMENT

### A.     District Court Jurisdiction.

The district court for the Western District of Wisconsin had subject matter jurisdiction in Case No. 3:17-cv-00549-wmc under 28 U.S.C. §§ 1331 and 1343(3). Plaintiffs Joseph Brown, Louis Weisberg, and Stephanie Losse ("Plaintiffs") invoked the federal question jurisdiction of the district court based on their claims that certain provisions of Wisconsin's "hunter harassment" statute, Wis. Stat. § 29.083 (the "Statute"), violate their rights under the First Amendment to the United States Constitution.

### B.     Appellate Jurisdiction.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. The judgment being appealed from was entered on December 10, 2020 and disposed of all issues in the case. No motion for new trial, alteration of judgment, or any other motion that would toll the time for filing the notice of appeal was filed in the district court. The notice of appeal was timely filed on January 8, 2021. This is not an appeal from a decision of a magistrate judge.

## ISSUES PRESENTED

I.     Did the district court err when it ruled that Plaintiffs did not have standing to bring either an as-applied challenge to the Statute or a facial challenge contending that the Statute imposed viewpoint-based or content-based regulation of protected speech?

II.     Does the Statute impose viewpoint-based or content-based regulation of protected speech, thereby triggering review of the Statute's constitutionality under strict scrutiny?

III.    Did the Defendants carry their burden of showing that the Statute serves a compelling governmental interest and is narrowly tailored to further that interest without burdening speech protected by the First Amendment?

IV.     Did the district court err when it held that the Statute was not facially overbroad?

V.      Did the district court err when it held that the Statute was not void for vagueness?

## STATEMENT OF THE CASE

### District Court Proceedings

Plaintiffs are individuals who have actively monitored hunting activities in Wisconsin by traveling to public lands in order to observe, film, photograph, and record the activities of hunters as they pursue game on those same public lands. Their activities are the necessary first step in pursuing their goal of informing the public about issues involving the status of hunting in Wisconsin and threats they believe hunting poses to Wisconsin wildlife. In 2016, the Wisconsin Legislature passed, and then-Governor Scott Walker signed, amendments to the Statute that, among other things, extended its scope to encompass "[p]hotographing, videotaping, audiotaping, or through other electronic means, monitoring or recording the activities" of a person engaged in hunting, fishing, or trapping. Wis. Stat. § 29.083(2)(a)7.c.

After the Statute went into effect on April 4, 2016, Plaintiffs were harassed and threatened by hunters and detained by law enforcement officials who invoked the Statute while Plaintiffs were attempting to observe and document hunters in the field. Plaintiffs filed their complaint on July 17, 2017.[1]  They alleged that the Statute violates the First Amendment, as a content- and viewpoint-based restriction on protected speech activities of documenting hunters and hunting in the field, which fails strict scrutiny; that it is unconstitutional because it is overbroad and because it is too vague; and that it does not satisfy the requirements for a lawful regulation of the "time, place, and manner" of speech. (D-1.)[2]

After the parties completed discovery, all Plaintiffs and all Defendants filed cross-motions for summary judgment on August 31, 2018. (D-30; D-19.) The motions were fully briefed as of October 29, 2018. (D-53; D-50.)

---

[1] Defendants are Jeffrey L. Kemp, Charles Simono, Mark Fruehauf, Angeline E. Winton, Kimberly Lawton, Kelly McKnight, Martha Milanowski, William Norine, Angela L. Beranek, Bruce R. Poquette, Matthew Tingstad, and Michael Nieskes, in their official capacities as District Attorneys of the State of Wisconsin, Scott K. Walker, in his official capacity as Governor of Wisconsin, Brad D. Schimel, in his official capacity as Attorney General of Wisconsin, Cathy L. Stepp, in her official capacity as Secretary of the Wisconsin Department of Natural Resources, and Todd A. Schaller, in his official capacity as Chief Warden of the Wisconsin Department of Natural Resources. As noted in the Docketing Statement, D-1-1, Some Defendants no longer occupy their official positions or offices. Josh Kaul is the current Wisconsin Attorney General, the current Washburn County District Attorney is Aaron Marcoux, the current Ashland County District Attorney is David Meany, the current Wisconsin Department of Natural Resources Secretary is Preston Cole, the current Wisconsin Governor is Tony Evers, the current Barron County District Attorney is Brian Wright, the current Wisconsin Department of Natural Resources Chief Warden is Casey Krueger, and the current Burnett County District Attorney is James Rennicke.

[2] Citations to materials in the district court record are cited by docket number and, when necessary, page, in the following format: "D-[docket number] at [page number]." Citations to the district court's opinion contained in the short appendix are cited as "A-[page number]."

3

On December 10, 2020, the district court entered its Opinion and Order granting Defendants' motion for summary judgment and denying Plaintiffs' motion for summary judgment. (A-1-23.) It entered final judgment that same day. (A-24.) This appeal followed.

**Factual Background**

Since 1990, Wisconsin has had a statute that forbids individuals from harassing hunters, fishers, and trappers while they are in the field. *See State v. Bagley*, 474 N.W.2d 761 (Wis. Ct. App. 1991). That statute, however, was much narrower than the Statute that Plaintiffs challenge in this appeal; most important, it did *not* extend the definition of prohibited acts to "[p]hotographing, videotaping, audiotaping, or through other electronic means, monitoring or recording the activities" of a person engaged in hunting, fishing, or trapping.

After many decades when wolves were legally protected under the Endangered Species Act, by 2012 Wisconsin and other nearby states were experiencing a resurgent wolf population and reopened legal wolf hunting. (D-24 at 6.) This was a controversial move, because many animal rights activists and others were vehemently opposed to the hunting of wolves. Some activists opposed all forms of hunting. (*See* D-16 at 13-15, 54-55.) Opponents of the wolf hunt organized. Some formed a group called Wolf Patrol, with the avowed purpose of monitoring hunters and trappers in the woods and fields, photographing and taking videos of them, and using the images they created and information they obtained to publicize their views about hunting and educate the public. (D-34 at 2-3; D-33 at 2-3; D-17 at 8; D-16 at 34, 46, 54.)

Plaintiffs are either affiliated with Wolf Patrol, have worked with it in the field, or have written about it as journalists. (D-34 at 2; D-17 at 8; D-35 at 2; D-33 at 2-3.) Plaintiff Joseph Brown is a professor of digital media and performing arts. As part of his work, Brown creates documentary films. (D-33 at 2; D-16 at 8-10.) He is interested in issues involving hunting and the outdoors. Starting with Wisconsin's 2014 wolf hunt, he began to accompany Wolf Patrol on its monitoring trips to give the group technical expertise in creating visual documentation of what it saw during the hunt. (D-16 at 14-15, 46, 54; D-33 at 2.) Brown has accumulated hundreds of hours of video showing not only wolf hunting and hunters, but confrontations between aggressive hunters and Wolf Patrol members. (D-33 at 2-3; D-16 at 48, 88.) At the time this case was filed, Brown's objective was to make a feature-length documentary about wolf hunting in Wisconsin and the controversies surrounding it. (D-33 at 2; D-16 at 87.)

At the time this case was filed, Plaintiff Louis Weisberg was the publisher and editor-in-chief of the *Wisconsin Gazette*, a publication that served as a trusted source for information about Wisconsin hunting and wildlife in general, and in particular about the wolf hunt, Wolf Patrol, and related controversies. (D-35 at 2.) Weisberg has long been active advocating for the interests of wolves and bears in Wisconsin, and he shares the goals of calling attention to aspects of hunting that he objects to. (D-35 at 2.) Weisberg has published articles and photographs by members of Wolf Patrol and other activists documenting the activities of hunters. (D-35 at 2.)

Plaintiff Stephanie Losse is an environmental and animal rights activist who volunteers with Wolf Patrol and who has participated in many monitoring trips to

observe hunters in the fields and woods of Wisconsin. (D-34 at 2; D-17 at 8, 10, 15.) She takes photographs and video recordings of hunters in action, so she can show them to the public as part of her efforts to call attention to her opposition to Wisconsin's wolf hunt. (D-34 at 2; D-17 at 8, 10, 15.) Even before the Statute was amended, law enforcement officials threatened Losse with prosecution for her hunt-monitoring activities. (D-34 at 2; D-17 at 21-22, 25-26, 31-33; D-36 at 2; D-36-4 at 2-8; D-33 at 4; D-16 at 69, 115.)

All three Plaintiffs used public roads to access public fields and forests owned by counties or the state of Wisconsin to observe and document hunters' activity on those lands. (D-34 at 2-3.) They would spend up to 14 hours in the field in a day taking video and photographs and collecting information. (D-33 at 2-3.) In 2014, certain wolf hunters who believed (wrongly) that observers sought to physically interfere with the hunt began to initiate confrontations with members of Wolf Patrol and other activists. (D-33 at 3-4; D-16 at 26, 29, 30, 32-36, 37, 39, 67; D-17 at 21, 23, 34-35.) Sometimes hunters would call law enforcement officers, and those officers would threaten the activist-observers with citation for violating the version of the Statute in effect at the time. This happened to Losse on several occasions, and Brown was also threatened with citation and prosecution. (D-33 at 3, 4; D-16 at 69, 115; D-34 at 2; D-17 at 22, 25-26, 32-33; D-36 at 2; D-36-4 at 2-8.)

The hunting community and its allies in the Legislature and the governorship sought to crack down on their critics by expanding the scope of the Statute. The legislative history of the 2016 amendments to the Statute demonstrates that legislative

leaders and pro-hunting activists specifically sought to craft legislation that would have the effect of making hunting opponents choose between abandoning their observation and documentation work on the public lands where hunting takes place, and continuing their project but running the risk of arrest, prosecution, and conviction. (D-36-3 at 2-4.)

Representative Adam Jarchow was the main sponsor of the bill that ultimately became the Statute. He testified in support of the bill, asserting that "this legislation had to be written . . . [because] there is a group of extremist anti-hunters out there who seem to enjoy making hunters' lives miserable." (D-47 at 1; D-47-2 at 2-18.) Representative Jarchow went on to identify the "group": it was "known as Wolf Patrol . . . [they] follow the hunters through the woods documenting LEGAL acts, much like stalking." (D-47 at 1; D-47-2 at 2-18.) Al Lobner, the president of the Wisconsin Bear Hunters Association, testified that the amendments were necessary because hunters should not be "scrutinized by those that do not share our views." (D-36 at 1-2; D-36-3 at 2.)

The Wisconsin Legislative Council, a nonpartisan agency whose duties include preparing summaries of proposed amendments and enacted statutes, issued a report confirming that the amendment was intended to target speech, not action: "[M]aintaining visual or physical proximity, videotaping, approaching, or other activities impede or obstruct a hunter *without any additional physical interference*." (D-36-1 at 4; D-47 at 2; D-47-4 at 2.) After the Statute was enacted, an attorney for the Wisconsin DNR, Craig Sparks, told an audience that "this amendment was really fueled by the

conflict between wolf and bear hunters, and protectionist groups, like Wolf Patrol . . . [it is a] substantive change . . . in response to Wolf Patrol and other organizations who either disagree with hunting or in the methods hunters use." (D-47 at 1; D-47-2 at 14-15.)

The amendment made several changes expanding the scope of conduct made criminal by the Statute. Most important, it broadened the list of prohibited acts, including: "Engaging in a series of 2 or more acts carried out over time, however short or long, that show a continuity of purpose and that are intended to impede or obstruct a person who is engaged in lawful hunting, fishing, or trapping, including any of the following:

    a.    Maintaining a visual or physical proximity to the person.

    b.    Approaching or confronting the person.

    c.    Photographing, videotaping, audiotaping, or through other electronic means, monitoring or recording the activities of the person. This subd. 7.c. applies regardless of where the act occurs.

    d.    Causing a person to engage in any of the activities described in subd. 7. a. to c.

Wis. Stat. § 29.083(2)(a)7. a.-d. Notably, Wisconsin issued a guidance memorandum stating that satisfying the intent requirement included in the amended statutory language "may be difficult in application." (D-26 at 4.)

The Statute did not achieve Defendants' asserted objective of averting conflict in the woods and fields where hunting takes place. In fact, the results were exactly

the opposite. Emboldened hunters threatened Brown and activists accompanying him that they would summon law enforcement to make arrests, because, they said, Brown and his companions were violating the Statute. (D-33 at 3-4; D-16 at 27, 37, 39, 67; D-17 at 21, 23; D-36 at 2.) Law enforcement officials repeatedly told Brown that he was violating the Statute (D-33 at 3; D-16 at 39); and in January 2018, they confiscated his cameras and all of the hunting footage he had shot, turning it over to the Forest County District Attorney, Defendant Charles Simono. (D-33 at 4; D-16 at 39-41; D-36 at 1,2; D-36-2 at 2-13, 23-28; D-36-5 at 2-5, 7-21.) Simono waited seven months before he returned Brown's property and advised that there would be no prosecution based on the events of January 2018. (D-33 at 4; D-16 at 69, 115; D-134 at 2; D-17 at 22, 25-26, 32-33; D-36 at 1, 2; D-36-4; D-36-5; D-36-2.)

## SUMMARY OF ARGUMENT

It is no exaggeration to say that hunting is favored by millions of people in Wisconsin. Timothy Van Deelen, an assistant professor of forest and wildlife ecology at the University of Wisconsin-Madison, asserted several years ago that deer hunting "is a treasured part of Wisconsin culture that connects people to nature and to their family and friends."[3] In 2008, middle school principal Ken Bartelt of Poplar, Wisconsin rejected efforts by People for the Ethical Treatment of Animals ("PETA") to make the school take down photographs showing students with the animals they have killed. Bartelt equated hunting in Wisconsin with one of America's most iconic sports

---

[3] https://badgerherald.com/news/2015/12/02/wisconsin-hosted-strong-turnout-from-deer-and-humans-alike-this-hunting-season/ (accessed on February 21, 2021).

teams: "Hunting is so ingrained in Wisconsin's culture, Bartelt says that [agreeing to PETA's request] is like telling kids they can't root for the Green Bay Packers."[4]

Because hunting enjoys the support of Wisconsin's political culture, the First Amendment right to criticize hunting is exposed to grave risk at the hands of political majorities eager to punish that criticism. Courts must be vigilant protecting the rights of dissenters to express their viewpoints, especially when their views are unpopular. "[F]reedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order." *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943). This case seeks to preserve the essential substance of freedom for critics and opponents of hunting in Wisconsin—and in so doing, to protect the First Amendment rights of *everyone* to gather information, create photographs and video recordings, and then use what they have created to speak out about issues of concern to them.

This Court must take the first step toward preserving that freedom by reversing the district court's decision that Plaintiffs lacked standing and therefore could not pursue their arguments that the Statute imposed unconstitutional viewpoint-based and content-based restrictions on speech. (A-14-16.) The district court erred in two ways: first, it erroneously ruled that because Plaintiffs disclaimed any intent to physically interfere with hunters, that necessarily meant that their activities fell outside the Statute's scope because they could not be prosecuted absent that intent. The

---

[4] https://www.rivertowns.net/sports/996239-peta-wants-northwestern-wisconsin-school-scrap-hunting-pictures (accessed on February 21, 2021).

decision ignores binding precedent that forbids courts from taking such a narrow view of intent requirements in the context of First Amendment standing. Under those cases, Plaintiffs' willingness to exercise their First Amendment rights might be chilled because a prosecutor could proceed based on an inference of intent even though Plaintiffs lacked the requisite mental state. Courts may not force speakers to concede guilt in order to challenge an unconstitutional restriction on speech.

Second, it wrongly concluded that there was no substantial threat that the Statute would be enforced against Plaintiffs in the future, ignoring the undisputed fact that after the Statute was enacted officials in Forest County seized Brown's camera equipment and hundreds of hours of stored video footage of hunters, kept the footage for several months (effectively preventing Brown from working on his movie or shooting additional video), and then returned it but refused to guarantee they would never prosecute him for any similar activity in the future.

Reversal of the district court's erroneous standing decision opens the door on appeal to Plaintiffs' arguments that the Statute impermissibly imposes viewpoint-based and content-based regulation of speech. By singling out First Amendment activity like photographing or videorecording hunters when done by persons opposed to hunting, the Statute favors one viewpoint over another. Similarly, by singling out people who photograph or videotape persons engaged in hunting, fishing, and trapping, while overlooking those who photograph or videorecord other lawful outdoor activities such as birdwatching, hiking, and swimming, the Statute draws distinctions by restricting speech based on its subject matter—the core of content-based

regulation. Viewpoint-based and content-based limits on speech alike trigger the government's obligation to meet the strict scrutiny test.

Strict scrutiny requires the Defendants to demonstrate facts establishing that (1) the Statute furthers a compelling governmental interest; and (2) the Statute is "narrowly tailored" to the attainment of that compelling interest. Defendants flunk both tests. The Statute's legislative history proves that the Legislature's real objective in enacting it was to create a tool that could be used directly to keep Plaintiffs and other critics of hunting out of the woods, stifling their ability to create compelling visual persuasive work and present it to the public. This partisan political goal falls far short of the compelling interest required. Similarly, the Statute is the opposite of narrowly tailored. It sweeps broadly to criminalize protected First Amendment activity, while leaving significant threats to public order in the woods unaddressed. This Court should strike the relevant portions of the Statute as unconstitutional.

The district court also erred when it rejected Plaintiffs' facial overbreadth challenge to the Statute. Its mistake was fundamental: it treated the Statute as a content-neutral regulation that did not have as its primary purpose the suppression of speech. This provides a separate and independent reason for this Court to reverse and declare the Statute unconstitutional.

Finally, the district court erred when it ruled that the Statute was not void for vagueness, failing to recognize the serious risk of arbitrary or discriminatory enforcement against those who wish to refrain from violating the Statute, but, as the court acknowledged, have legitimate concerns their behavior "could be interpreted

differently by a law enforcement or private citizen as *intended* to interfere with hunting rights." (A-18-19; emphasis in original.)

<div align="center">

**ARGUMENT**

</div>

**Standard of Review**

An order granting summary judgment is reviewed de novo. *Greater Rockford Energy & Technology Corp. v. Shell Oil Co.*, 998 F.3d 391, 394 (7th Cir. 1993).

**I.    Plaintiffs Have Standing To Challenge The Statute.**

**A.    Standing Exists When A Statute Has A Chilling Effect On First Amendment Rights.**

Plaintiffs are suffering a classic First Amendment injury: a chill to their protected speech activities. Plaintiffs are a filmmaker, a newspaper publisher, and a citizen-activist who photograph and videorecord hunts on Wisconsin public lands to further their newsgathering and advocacy on hunting practices in this state, a matter of significant public concern and debate.

Plaintiffs have repeatedly been stopped and threatened with citation under the Statute, because it was amended in 2016 to target Plaintiffs' First Amendment activities—specifically, maintaining a "visual proximity" to hunting, and photographing and videorecording it. Having been so threatened, and having every objectively reasonable assurance that they could face prosecution if they resumed documenting and recording hunts, Plaintiffs are thus refraining from their desired speech activities. In finding that Plaintiffs lacked standing, the district court erroneously held them to a higher standard than the law allows, because a chill on protected speech is an independent First Amendment injury.

<div align="center">13</div>

Standing to sue is a requirement imposed by Article III of the Constitution, which mandates that federal courts may adjudicate only those disputes that qualify as a "case or controversy" between the parties. This obligates plaintiffs to establish standing by meeting three requirements: "(1) an injury-in-fact; (2) causation; and (3) a likelihood that the injury will be redressed by a decision in the plaintiffs' favor." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Federal courts have long recognized that First Amendment rights are so important, and so easily threatened by over-aggressive governmental action, that plaintiffs claiming that their right to speak, publish, or gather information has been abridged may seek redress even before they have been prosecuted or convicted under a law that violates the First Amendment. "Self-censorship" is a distinct "harm that can be realized without an actual prosecution." *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 393 (1988). "The chilling of protected speech may thus alone qualify as a cognizable Article III injury provided the plaintiffs 'have alleged an actual and well-founded fear that the law will be enforced against them." *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 473-74 (7th Cir. 2012), quoting *American Booksellers*, 484 U.S. at 393.

As a result, "[a]ctual arrest, prosecution, or other enforcement action is not a prerequisite to challenging [a] law." *Susan B. Anthony List v. Dreihaus*, 573 U.S. 149, 158 (2014) ("*SBA List*"). Plaintiffs asserting such a "pre-enforcement" challenge in a suit for prospective relief—like this one—demonstrate an injury-in-fact where they show "an intention to engage in a course of conduct arguably affected with a

constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

The special status of First Amendment rights means that it is not difficult to clear the bar for showing an injury sufficient to support standing. The courts recognize that citizens must have the ability to challenge statutes that unconstitutionally restrict speech, and accordingly have relaxed the more rigorous rules governing standing for other claims. *E.g., American Booksellers Ass'n*, 484 U.S. at 393. Plaintiffs have standing to seek prospective relief based on a statute's chilling effect on protected speech when they show (1) they have previously engaged in the type of speech affected by the statute; (2) they have a present desire to engage in such speech in the future; and (3) a plausible basis to claim that they have no present intention to engage in the prohibited speech because of a credible threat that the statute will be enforced. *See Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012). Plaintiffs have standing when they show a "modest probability" of injury. *Wiesmueller v. Kosobucki*, 571 F.3d 699, 703 (7th Cir. 2009). Put another way, standing exists "when the plaintiff suffers an actual or impending injury, no matter how small[.]" *Brandt v. Village of Winnetka*, 612 F.3d 647, 650 (7th Cir. 2010). "Injury need not be certain . . . . [P]erhaps the law won't be enforced as written," but standing still exists when "the probability is materially greater than zero" that the law *will* be enforced against a right protected by the First Amendment. *Id*. Furthermore, when there are multiple plaintiffs and at least one has standing, "jurisdiction is secure and the court will adjudicate the case

whether the additional plaintiffs have standing or not." *Ezell v. City of Chicago*, 651 F.3d 684, 696 n.7 (7th Cir. 2011).

The district court erred because it failed to give these principles sufficient weight. Instead, it turned the law of First Amendment standing inside out and effectively required Plaintiffs to prove that they were nearly certain to be prosecuted under the Statute. The court began its standing analysis by concluding that Plaintiffs proved injury-in-fact because they "have sufficiently demonstrated their intent to engage in filmmaking, photographing, or newspaper reporting of hunting, specifically wolf hunting," (A-11), and by acknowledging this Court's holding that "[t]he act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to distribute the resulting recording." (A-11 (quoting *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012).) From there, however, the district court went awry, erroneously concluding that "plaintiffs have not put forth evidence that their conduct is 'arguably proscribed . . . by [the] statute they wish to challenge,' nor that the threat of future enforcement . . . is substantial." (A-11 (quoting *SBA List*, 573 U.S. at 162, 164.))

## B.   Plaintiffs' Protected Activity Falls Within The Scope Of The Statute.

The district court relied on the Statute's intent requirement to conclude that "plaintiffs' conduct here is neither expressly covered by the statute nor is the threat of prosecution latent in the statute[,]" because "plaintiffs have failed to direct the court to a clear, or even arguable, indication that their conduct of filming,

photographing, or observing hunting violates the statute without proof of their intent to interfere with activity associated with lawful hunting, fishing, or trapping." (A-15.)

In effect, the district court concluded that Plaintiffs were trapped by an internal contradiction: by denying any intent to interfere with the hunt (*see* D-33 at 2; D-16 at 15, 46, 54; D-17 at 46), they necessarily removed themselves from the scope of the Statute's intent requirement. Ironically, *the district court itself* highlighted the flaw in this reasoning when it analyzed the First Amendment affirmative defense provided in the Statute: notwithstanding Plaintiffs' disclaimer of intent to interfere, the court ruled that their "conduct could be interpreted differently by a law enforcement officer or private citizen as *intended* to interfere with hunting rights." (A-19; emphasis in original.) The district court should have applied this accurate observation—that Plaintiffs' professed mental state was insufficient to prevent prosecution—to its analysis of standing. It should also have taken into account the Defendants' own admission in a guidance memorandum that satisfying the intent element "may be difficult in application." (D-26 at 4.)

Instead, it ignored Defendants' concession about the uncertainty caused by the intent requirement, just as it disregarded Plaintiffs' uncontradicted averments that they curtailed their photography and videorecording of hunters in action because of their concerns that law enforcement would not interpret their intent benignly (D-16 at 78-79; D-17 at 46) and that they feared the threat of criminal prosecution in general. (D-33 at 3; D-16 at 25-26, 66, 74-75; D-34 at 2-3; D-17 at 27, 27-28, 43; 47.) Remarkably, the district court also refused to consider the Statute's legislative

history as a measure adopted specifically to target the activities of "extremist anti-hunters" like Wolf Patrol and its allies Plaintiffs Brown and Losse. (D-47 at 1; 47-2.) Taken together, all of these facts support an interpretation of the Statute that brings Plaintiffs' conduct squarely within the zone of prohibited conduct.

The district court also erred by misinterpreting controlling case law, reading into it a requirement that a pre-enforcement challenge could be supported only if there had been an actual prosecution in the past. (A-11-13.) But that is not what the cases say. In *SBA List*, the Supreme Court rejected an argument against standing essentially identical to the district court's reasoning below. That case involved a challenge to an Ohio statute that created both civil and criminal liability based on knowing falsehoods made during an election campaign. The plaintiff, a political advocacy organization that had been named in an administrative complaint under the statute, sued seeking a declaration that the statute unconstitutionally abridged its First Amendment rights, and the administrative complaint was withdrawn while its suit was pending. The Sixth Circuit affirmed the district court's dismissal of the case on ripeness grounds, holding that because the plaintiff could be found guilty only for making a statement that it knew was false, its insistence that it did not plan to lie or disregard the truth of its speech necessarily rendered "'the possibility of prosecution for uttering such statements exceedingly slim.'" 573 U.S at 163 (quoting 525 Fed. Appx. 415, 422 (6th Cir. 2013).)

The Supreme Court reversed, finding that such reasoning "misses the point." *Id*. SBA's truth defense failed to prevent the administrative proceedings; thus, "there

is every reason to think that similar speech in the future will result in similar proceedings, notwithstanding SBA's belief in the truth of its allegations. Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Id.*

Like the advocacy group in *SBA List*, Plaintiffs face prosecution under a statute that targets speech with an element that requires the state to prove the speaker had a particular mental state as a requirement for conviction. Like the advocacy group, Plaintiffs claim that they reasonably fear prosecution despite their denial of the mental state required to show a violation. *SBA List* means that the government cannot avoid a First Amendment challenge by using a speaker's denial of wrongful intent as a Catch-22 that eliminates standing. *See also Babbitt*, 442 U.S. at 301 (speaker's denial of intent to "propagate untruths" that violated a state statute barring the use of false statements did not defeat standing because the speaker had previously engaged in publicity campaigns and intended to continue doing so).

This Court has employed similar reasoning to uphold First Amendment standing. In *Hoover v. Wagner*, 47 F.3d 845, 847-48 (7th Cir. 1995), it rejected an analysis of a statutory intent requirement that was fundamentally indistinguishable from the district court's approach here. *Hoover* involved a challenge by two anti-abortion protesters and a journalist to the constitutionality of a state-court injunction restricting protests near abortion clinics. All three plaintiffs "disclaim[ed] any intention of deliberately thwarting the decree on their own as vigorously as they disclaim any intention of acting in concert with the people named in the decree to thwart it." *Id.* at 847.

Because they lacked the requisite intent to violate the injunction, the district court concluded the plaintiffs had nothing to fear from it, and dismissed the case for lack of standing.

This Court ruled that the district court erred. Probability, not certainty, of tangible harm is all the plaintiffs were required to show for standing. Without relief limiting the application of the state court's injunction, the plaintiffs would be forced to choose between forgoing their right of free speech or exposing themselves to arrest and prosecution. *Id*. The *Hoover* court ruled that it "could not reckon the possibility of these consequences being low," because "police and other law enforcement officers [might] interpret the injunction in a way that subjects [the plaintiffs] to arrest," notwithstanding their disclaimer of intent to violate the decree. *Id*.

*Hoover*—which Plaintiffs cited and discussed in their briefs below (D-44 at 10; D-53 at 7-8, 12), but which the district court failed to discuss—establishes that intent requirements cannot be mechanistically applied to deny standing to First Amendment plaintiffs who disavow any intent to violate unconstitutional statutes on the grounds that their lack of the requisite intent means they have no reason to fear being prosecuted. *SBA List* further supports that result. Holding otherwise would impermissibly allow governments to chill protected speech, because citizens know their own averment of subjective intent cannot guarantee they will not in fact be prosecuted. Because the district court erred when it concluded that Plaintiffs failed to show a substantial likelihood of future prosecution under a statute that explicitly covered

their First Amendment activities, this Court should reverse the district court's decision.

### C.     Plaintiffs Showed A Substantial Threat Of Future Prosecution.

This Court follows the rule that express disavowals of intent to prosecute "are important only in cases which, without a disavowal, the plaintiff seeking to enjoin enforcement would have a reasonable basis for concern that he might be prosecuted." *Lawson v. Hill*, 368 F.3d 955, 959 (7th Cir. 2004). A reasonable fear of prosecution, in turn, necessarily means that there is a well-founded basis for a person to self-censor in order to avoid prosecution, because in such cases, a threat of prosecution is "latent in the existence of the statute." *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003). The district court erred in concluding that Plaintiffs received a credible disavowal of future prosecution.

In ruling that Plaintiffs had not shown a reasonable threat that they would be prosecuted in the future, the district court focused on the June 20, 2017 meeting between DNR officials, district attorneys, and federal and state law enforcement officials where the officials "agreed the conduct that produced the Wolf Patrol videos did not constitute interference with hunting, fishing, or trapping and, therefore, did not violate [the statute];" specifically, it relied on "*subsequent* DNR guidance" that confirmed there must be an actual intent to interfere with the hunt-related activities identified in the Statute. (A-14; emphasis added.)

The district court treated these assurances of non-enforcement as dispositive—an incomprehensible result, because its analysis of whether there existed a plausible threat of future enforcement did not even mention the undisputed fact—discussed for

a *full page* in its opinion (A-8)—that on January 27, 2018, almost six months *after* the June 2017 meeting emphasized in the district court's opinion, Plaintiff Brown was accosted on a public road by Forest County Sheriff's Department officers, who "seized [his] camera equipment and all of his stored footage, including three video cameras, a digital camera, his cellphone and two SD cards, and searched those items." (*Id.*) Twelve days later, a Forest County judge issued a search warrant that "cited a possible violation of [the Statute] as grounds for the search and seizure of Brown's equipment and footage." (*Id.*)

Forest County stifled Brown's First Amendment rights for seven months; not until August 2018—midstream in this litigation—did Defendant District Attorney Charles Simono officially authorize the return of Brown's SD cards and conclude that "neither now nor in the future will I issue any charges based on the January 27, 2018 event." (D-27 at 3; D-42 at 3.) For a significant amount of time, because Forest County had his original footage, Brown could not work on his feature film documenting the wolf hunts; because he did not have his cameras, he was unable to continue to exercise his clear First Amendment right to film and gather information; and he lived under the threat of prosecution for violating the Statute. (D-16 at 69, 115.) Worst of all, District Attorney Simono did not promise to forego any future prosecutions for violations of the Statute, or any future seizures of his equipment; all that he said was that there would be no prosecution for the incident on January 27, 2018.

It is no wonder that both Brown and Losse stopped documenting wolf hunting on county- and state-owned land. (D-17 at 27-28; D-16 at 66.) Losse specifically

singles out the Statute as the reason why she stopped. Even before the amendments, she had been threatened with prosecution under the previous version several times; she concluded after the amendment went into effect that the risk of continuing to participate was too great. (D-17 at 47.) Using this Court's terminology from *Speech First, Inc. v. Killeen*, 968 F.3d 628, 642 (7th Cir. 2020), the actions of Forest County's sheriff's department and District Attorney, as well as the other law enforcement officers who told Plaintiffs and others that their conduct was covered by the Statute (D-33 at 4; D-16 at 66, 69, 115; D-34 at 2; D-17 at 22, 25-26, 27 32-33; D-36 at 2; D-36-4; 36-2; 36-5), were unlawful "attempts to coerce" rather than permissible "attempts to persuade;" they not only threatened but actually imposed adverse consequences. Nothing more is required to show standing.

It is impossible to know how the district court thought the confiscation of Brown's equipment and the pending threat of prosecution should affect its conclusion that there existed no substantial threat of future enforcement against the Plaintiffs, because the district court treated the confiscation and the threat as if they had never happened. This was error. The most contemporaneous evidence of the government's behavior enforcing the statute is not, as the district court implied, the June 2017 "reassurance" meeting; it is the subsequent confiscation of Brown's equipment, the consequent sidelining of his First Amendment-protected activities, and his having to live with the threat of criminal prosecution hanging over his head for seven months—culminating with a prosecutor's silence about the possibility of future prosecutions based on similar conduct.

To be sure, Brown was relieved to learn that he would not be prosecuted for the January 2018 incident, but by remaining silent about the future, the government did not go far enough to negate a substantial threat of future enforcement. "The Supreme Court has instructed us that a threat of prosecution is credible when a plaintiff's intended conduct runs afoul of a criminal statute and the Government fails to indicate affirmatively that it will *not* enforce the statute." *Commodity Trend Serv. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 687 (7th Cir. 1998) (emphasis in original). Defendant Simono's no-prosecution decision did not disclaim future prosecution.

Finally, the newer the statute, the more likely it is that it will be used to threaten the punishments it was enacted to impose. *See Animal Legal Defense Fund v. Reynolds*, 297 F. Supp. 3d 901, 916 (S.D. Iowa 2018). Brown's equipment and video footage was confiscated less than two years after the Statute went into effect. That short time span weighs heavily in favor of standing.

### D.    Plaintiffs' Injury Is Traceable To The Statute And The Defendants And Would Be Remedied By A Decision In Plaintiffs' Favor.

The final elements of Article III standing are a sufficient causal connection between the injury and the defendant's wrongful action and a likelihood that the injury will be redressed by a decision in favor of the plaintiff. In pre-enforcement challenges, the injury is caused by the very existence of the statute. It is unnecessary to show that a defendant has singled out a plaintiff for punishment. *See Bennett v. Spear*, 520 U.S. 154, 165-69 (1997). The essence of Plaintiffs' injury is that the Statute unlawfully chilled their exercise of First Amendment rights. All they need do is

demonstrate that the chilling effect is fairly attributable to the Statute as opposed to other factors. *See Lexmark Int'l Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 125 (2014); *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 803 (7th Cir. 2016).

Plaintiffs asserting that a statute infringes their First Amendment rights may establish standing by showing that the defendants are authorized to enforce that statute. *See Balogh v. Lombardi*, 816 F.3d 536, 543 (8th Cir. 2016); *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007). Defendants themselves confirm that they are responsible for enforcing the Statute. (D-29 at 5, 9-11; D-16 at 102-106). Wisconsin law mandates that district attorneys are responsible for enforcing the state's criminal laws. Wis. Stat. § 978.05(1), (5).

Likewise, Plaintiffs' injury will be redressed by a decision in their favor, because a declaratory judgment or permanent injunction forbidding enforcement of the Statute will lift the chilling effect by completely eliminating the threat of future prosecution. *See Perez v. Ladesma*, 401 U.S. 82, 104 (1971); *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 369 (1971). When Plaintiffs no longer have a fear of prosecution, they are free to exercise their First Amendment rights with no chill to deter them.

## II.   The Statute Impermissibly Targets Speech Based On Its Content And Its Viewpoint.

The Statute directly targets—and criminalizes—protected speech and speech-creating activities in a content- and viewpoint-based manner. First, it targets protected First Amendment activity—photography, videography, and newsgathering—

25

based on the content of the speech or the images recorded (concerning hunters and hunting activities.) Further, it criminalizes speech only when the speaker can be inferred to have an intent to disrupt the hunt, targeting speech against hunting while favoring that in support, as the legislative history and related materials make clear was the very reason why the Statute was amended.

The district court's ruling on standing led it to conclude that its decision "effectively closes the door to any content or viewpoint-based challenges." (A-16.) As a result, the decision below did not address whether the Statute imposed a content- or viewpoint-based restriction, and whether, if so, it could survive strict scrutiny. Because the record is complete on those issues, this Court should promote prudent use of judicial and party resources and proceed to resolve them now.

### A. The Statute Targets Protected Speech And Speech-Facilitating Activities.

The first step requires the Court to assess whether the challenged law is directed at activities protected by the First Amendment. There is no doubt that it is; it is explicitly aimed at "photographing, videotaping, audiotaping, or through other electronic means, monitoring or recording the activities of" hunters. Wis. Stat. § 29.083(2)(a)7.c. To hold otherwise would be tantamount to contending that although the First Amendment fully protects citizens' rights to publish books, it leaves governments free to imprison people for writing them. "Whether government regulation applies to creating, distributing, or consuming speech makes no difference." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 792 n.1 (2011). "The act of making an audio or audiovisual recording is necessarily included within the First Amendment's

guarantee of speech." *Alvarez*, 679 F.3d at 595. "The act of recording is itself an inherently expressive activity; decisions about content, composition, lighting, volume, and angles, among others, are expressive in the same way as the written word or a musical score." *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018). Even the Statute's provisions prohibiting "maintaining a visual or physical proximity" to or "approaching or confronting" a hunter, Wis. Stat. §§ 29.083(2)(a)7. a and b, are aimed at suppressing First Amendment activity, because a creator like Plaintiff Joe Brown may believe that for expressive purposes, it is necessary for him to film or record hunters from angles or distances that he believes will best convey the message he wishes to communicate to the audience for his creative works. (The speech-suppressing character of these provisions will be even more obvious after we examine the legislative history of the 2016 amendments.)

### B.    The Statute Is Facially Content-Based.

The core of First Amendment protection safeguards citizens against laws that single out messages or speech because of their "ideas, subject matter, or content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95-96 (1972). Government regulation aimed at speech based on its *content* presumptively offends the First Amendment. In *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), the Supreme Court defined three ways in which a regulation might qualify as "content-based." The first two categories encompass what the law terms "facial" content regulations: "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." A third category of content-based regulations is made up of laws that appear content-

27

neutral on their face, but "that cannot be 'justified without reference to the content of the regulated speech,' or that were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). All three categories of content-based regulations are invalid unless they satisfy strict scrutiny. *Id.*

The Statute satisfies all three ways in which a regulation is classified as content-based. "[T]he crucial first step in the content-neutrality analysis [is] determining whether the law is content-neutral on its face." *Reed*, 576 U.S. at 165. The test for facial content neutrality asks whether the government enforcing the law must examine the words or images of a message to determine whether they violate a challenged law. If so, that law is content-based. *See F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 383 (1984); *Norton v. City of Springfield*, 806 F.3d 411 (7th Cir. 2015) (anti-panhandling ordinance was content-based because "[a] police officer seeking to enforce the City's ordinance must listen to what the speaker is saying in order to determine whether the speaker has violated the ordinance").

Under this test, the Statute is content-based, because its restriction on photography and recording prohibits documenting "the activities *of the person*" engaging in lawful hunting, fishing, or trapping. Wis. Stat. §29.083(2)(a)7.c (emphasis added). Recording or photographing the scenery in fields or forests, hikers, or birdwatchers, or even the animals being hunted, would not violate the statute on its face so long as the hunter's activities were not shown. Of course, law enforcement could make this decision only by viewing the contents of the videotape or photograph—which is

exactly what happened when Forest County sheriffs seized Brown's camera equipment and stored footage: they watched the footage before sending it to the District Attorney to evaluate a potential prosecution. (D-36 at 2; D-36-5.) Therefore, under *Reed* and *Norton* the Statute is facially content-based, justifiable only if it can survive strict scrutiny.

The second test for content-based restrictions on speech examines the function and purpose of the regulation. *Reed*, 576 U.S. at 163. In the context of resolving Plaintiffs' facial overbreadth and vagueness challenges to the Statute, the district court credited the government's assertion that the Statute was passed for the purpose of "preventing conflict in the woods, particularly armed conflict[.]" (A-21.) But the district court erred by failing to examine that purpose in greater detail. Plaintiffs entered the woods armed only with notebooks and cameras, so any desire to avoid "armed conflict" must have arisen from the government's desire to prevent enraged armed hunters from shooting at Plaintiffs and others exercising their First Amendment rights to observe the hunt on public land.

Enacting the Statute based on fear that hunters might react with violence to the presence of Plaintiffs and their allies, however, means that the Statute is a content-based regulation subject to strict scrutiny. "Listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992). "Speech cannot be financially burdened, *any more than it can be punished or banned*, simply because it might offend a hostile mob." *Id*. (emphasis added). "The police must preserve order when unpopular speech disrupts it." *Ovadal*

29

*v. City of Madison*, 416 F.3d 531, 537 (7th Cir. 2005). The Defendants' desire to prevent armed conflict by squelching Plaintiffs' First Amendment rights in order to ensure that hunters are not provoked into a murderous rage by the sight of creative artists, journalists, and citizen-activists, without more, means that the Statute is content-based.

Even were the Statute content-neutral on its face—which it is not—it would still be content-based under *Reed*'s third test. Courts deem content-based any law that is on its face content-neutral, but was in fact "adopted by the government 'because of disagreement with the message [the speech] conveys.'" 576 U.S. at 164 (quoting *Ward,* 491 U.S. at 791). A legislative purpose to target content may be sufficient to prove that a seemingly neutral law is in fact a presumptively impermissible effort to regulate the content of speech. *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). Even when a statute appears to be facially neutral (again, *not* the case here), "its purpose to suppress speech and its unjustified burdens on expression would render it unconstitutional." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 556 (2011).

The legislative history of the 2016 amendments to Wis. Stat. § 29.083 proves with crystal clarity that pro-hunting legislators and citizens alike expressly sought to suppress speech and send a message to Plaintiffs and their allies that they were not wanted in the woods. The lead sponsor of the 2016 amendments, Representative Adam Jarchow, explained that the purpose of the new provisions was to stop "extreme anti-hunters" from monitoring hunts. (D-47 at 1; D-47-2.) Al Lobner, president of the

Wisconsin Bear Hunters Association, testified to the Wisconsin Senate Committee on Sporting Heritage that the amendments were necessary because hunters should not be "scrutinized by those who do not share our values." (D-36 at 1-2; D-36-3.)

We mean no disrespect to the hunters of Wisconsin when we say that it is hard to imagine a more fundamentally anti-American sentiment than believing that one group of citizens is immune from scrutiny by all others who do not "share their values." Our Constitution demands exactly the opposite: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. Plaintiffs seek to observe, document, and challenge a longstanding, widely popular element of Wisconsin culture. Nothing could be more patriotic. As an effort to place one category of content beyond criticism, the Statute is subject to strict scrutiny.

## C.     The Statute Is Viewpoint-Based.

A statute that seeks to regulate speech based on the substantive *viewpoint* of a message "is an egregious form of content discrimination" and is "presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828-29 (1995). A law that punishes speech based on the viewpoint expressed will also be struck down unless it satisfies strict scrutiny analysis. *Turner,* 512 U.S. at 642.

The Statute impermissibly imposes viewpoint-based restrictions on speech. First, it discriminates based on the viewpoint of filmmakers, photographers, or observers gathering information. For example, if the activities of a film crew making a documentary to praise the tradition of hunting in Wisconsin had the effect of

hindering a hunting party's ability to pursue its quarry, there would be no violation of the Statute because the crew lacked the requisite intent to interfere with the hunt. In contrast, creative artists like Brown, activists like Losse, or publishers like Weisberg who question hunting practices yet deny an intent to interfere would nevertheless be subject to prosecution based on the expansive capacity of the Statute's intent requirement, which even the district court and Defendants acknowledged was susceptible to manipulation by law enforcement. (A-18-19; D-26 at 4.)

Finally, the legislative history of the 2016 amendment (discussed in detail at pages 7-8 and 30-31, *infra*) establishes conclusively that the Statute is viewpoint-based. Indeed, Defendants admitted that one of the amendment's purposes was "the promotion of hunting culture." (D-20 at 10-11.) Hunting enthusiasts sought to twist the law to punish activists for having the temerity to investigate their activities on public property, and the Legislature made sure they hit the target.

## III.    The Statute Cannot Survive Strict Scrutiny.

The Statute must fall because Defendants can point to no legitimate—let alone compelling—state interest that could justify the facially content- and viewpoint-based restrictions on speech imposed by the 2016 amendment. Laws that regulate based on viewpoint and content are presumed invalid unless the government can demonstrate that they comply with the rigorous requirements of First Amendment strict scrutiny. It is always the government's obligation to carry this burden. *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011).

To sustain the Statute under strict scrutiny, Defendants must demonstrate *with evidence* that the Statute furthers a compelling governmental interest, and that

32

the Statute is "narrowly tailored" to the achievement of that compelling interest. *Reed*, 576 U.S. at 163. Put another way, "the Government's chosen restriction on the speech at issue must be 'actually necessary' to achieve its interest." *United States v. Alvarez*, 567 U.S. 709, 725 (2012) (quoting *Brown*, 564 U.S. at 799). "There must be a direct causal link between the restriction imposed and the injury to be prevented." *Id*.

### A.   The Statute Does Not Serve A Compelling State Interest.

The Statute satisfies neither of the requirements imposed by strict scrutiny. Based on the undisputed legislative history of the 2016 amendments and the plain fact that both before and after the amendments, Wis. Stat. § 29.083 contained several provisions directly prohibiting physically impeding or obstructing a person lawfully hunting, fishing, or trapping that were sufficient to protect any compelling interest in averting violence, it is evident that the purported objective of the Statute—the prevention of "armed conflict" in the woods (A-21) is a pretext. The *real* governmental interest is and always has been the suppression of hunting opponents' First Amendment-protected speech. Defendants even admit that one of the interests served by the Statute is "the promotion of hunting culture" (D-20 at 10-11)—yet it pursues that goal by restricting the First Amendment rights of hunting opponents. Standing alone, this concession defeats Defendants' claim of a legitimate, compelling interest. Courts in other jurisdictions concur; they hold that promoting hunting is not a compelling state interest. *E.g., Dorman v. Satti*, 862 F.2d 432, 437 (2d Cir. 1988) ("There is no showing that protecting hunters from harassment constitutes a compelling state interest"); *People v. Sanders*, 696 N.E.2d 1144, 1148-49 (Ill. 1998) (allowing hunting was

33

"reasonable and legitimate" state interest but not "of such magnitude as to constitute a compelling interest," especially where the legislature decided "to protect that interest by targeting expression of an opinion, as opposed to intentional, disruptive behavior in general").

### B.     The Statute Is Not Narrowly Tailored.

Even assuming for argument's sake that the "conflict prevention" justification advanced for the Statute was both genuinely offered and sufficiently compelling to pass muster under strict scrutiny, the Statute still flunks the test because preventing conflict in the fields and woods of Wisconsin could be accomplished by means significantly less restrictive of First Amendment rights than the provisions of the Statute. "Narrow tailoring" requires courts to decide whether the challenged law "focuses on the source of the evils the [government] seeks to eliminate . . . and eliminate[s] them without at the same time banning or significantly restricting a substantial quality of speech that does not create the same evils." *Ward*, 491 U.S. at 800 n.7.

The narrow-tailoring test is flunked again when the challenged law is under-inclusive—meaning that it leaves untouched significant activity that threatens the purported compelling state interest as much as or more than the activity targeted by the law at issue. "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802. A law also fails strict scrutiny when it is overinclusive: that is, when it is not the least restrictive means to achieve the government's declared objective. *United States v. Playboy Entertainment Group, Inc*, 529 U.S. 803, 818 (2000).

34

Like the Kansas "Ag-Gag" statute invalidated in *Animal Legal Defense Fund v. Kelly*, 434 F. Supp. 3d 974, 1002 (D. Kan. 2020), the Statute is both under- and overinclusive. It is underinclusive because it does not "prevent everyone from violating" the rights of persons engaged in hunting, fishing, or trapping—only those who act with the requisite prohibited intent. People who accidentally or negligently interfere with the hunt are off the hook—yet they presumably do as much harm to the protected class of hunters as those whose objective is to hinder the hunt. Moreover, assuming the Legislature truly sought to deter armed conflict in the woods, the Statute is also underinclusive because it protects only "lawful" hunting, fishing, and trapping, leaving citizens free to interfere with (presumably) armed persons *unlawfully* taking game and fish—who objectively pose a more serious chance of starting a shooting war.

The Statute also fails strict scrutiny because there are many alternative options to prevent interference with hunting that do not burden First Amendment rights, meaning that it is overinclusive. Most obvious are the pre-amendment provisions of Wis. Stat. §§ 29.083(2)(a)2. and 3., which prevent physically "impeding or obstructing" persons engaged in hunting, fishing or trapping or activities associated with hunting, fishing or trapping. Before the district court, neither Defendants nor the court identified any reason why these provisions were not sufficient to fully protect the government's legitimate interest in preserving the peace in Wisconsin's fields, streams, and woods—let alone provided evidence demonstrating the need to target protected speech-creating activities to further that interest.

Plaintiffs challenge Defendants to present any plausible fact pattern involving a person who physically interferes with activity protected by Wis. Stat. § 29.083 through photographing, videotaping, audiotaping, or otherwise monitoring or recording hunters—but does not also violate Wis. Stat. §§ 29.083(2)(a)2. or 3. They will not be able to do so. The provisions of the Statute that do not target speech will *always* also be violated by any act that violates the speech-restricting provisions, making the 2016 amendment entirely superfluous—unless its purpose is to target speech that the government doesn't approve. That is exactly its purpose.

When governments have statutes at their disposal that already serve the goals they wish to pursue, courts invariably find that those governments can combat the problems "very effectively without resorting to a broad prohibition on" First Amendment-protected activity. *Horina v. City of Granite City*, 538 F.3d 624, 635 (7th Cir. 2008); *see also Comite de Jornaleros v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011) (en banc) (striking down ordinance that targeted First Amendment activity because the city "has various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech"). The Statute fails strict scrutiny.

## C.    Facial Relief Is Warranted.

Plaintiffs sought in the district court the same relief they seek here: because the Statute is on its face both content- and viewpoint-based, and because the Defendants cannot satisfy strict scrutiny, a declaratory judgment and permanent injunctive relief barring enforcement of Wis. Stat. §§ 29.083(2)(a)7.a.-d. Although the district court evaluated Plaintiffs' standing to bring an as-applied challenge (A-10-A-16),

reversing its erroneous conclusion on standing does not limit Plaintiffs to relief limited to their own personal situations. "The label is not what matters. The important point is that plaintiffs' claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs. They must therefore satisfy our standards for a facial challenge to the extent of that reach." *Doe v. Reed*, 561 U.S. 186, 194 (2010); *see also Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 331 (2010) (the distinction between facial and as-applied challenges "is both instructive and necessary, for it goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint").

Laws that facially target the content or viewpoint of speech and fail strict scrutiny are unconstitutional, not only for plaintiffs who prevail and invalidate them, but for everyone. *E.g., Playboy Entertainment Group*, 529 U.S. at 813 (holding statute unconstitutional based on failure to satisfy strict scrutiny); *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 123 (1991) (same.) This Court is empowered to grant Plaintiffs the relief they seek declaring the entirety of Wis. Stat. §§ 29.083(2)(a)7.a.-d. unenforceable.

## IV.     The Statute Is Unconstitutionally Overbroad.

The Statute fails because it prohibits substantially more speech than the First Amendment permits. *United States v. Stevens*, 559 U.S. 469 (2010). An overbreadth claim need not prove that the challenged law is unconstitutional in every application; even if the law has some legitimate scope, it may still be vulnerable to the overbreadth doctrine when it sweeps so broadly that it penalizes a substantial amount of speech that is actually protected. *See Bell*, 697 F.3d at 453.

37

The district court correctly ruled that Plaintiffs could maintain their facial overbreadth challenge despite its adverse ruling on standing. (A-19.) It erred, however, by ignoring the fact that the Statute was expressly designed to punish opponents of hunting. Instead, the district court's analysis got off on the wrong foot by treating the Statute as one of the "ordinary criminal laws that are sought to be applied to protected conduct." (*Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). This framework might have been appropriate had Plaintiffs been challenging the application of Wisconsin's criminal statutes prohibiting stalking (Wis. Stat. § 940.32), harassment (Wis. Stat. § 947.013), disorderly conduct (Wis. Stat. § 947.01), or recklessly endangering safety (Wis. Stat. § 941.30) to their videography and information-gathering activities.

The district court's use of the "ordinary criminal laws" framework of *Broadrick* was error, however, because the 2016 amendments of the Statute are not ordinary or generally applicable criminal laws. Instead, they are aimed directly at the protected First Amendment pursuits of "photographing, videotaping, audiotaping," or otherwise electronically "monitoring or recording" persons engaged in activities covered by Wis. Stat. § 29.083. *See Alvarez*, 679 F.3d at 595 ("[t]he act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to distribute the resulting recording").

Because the district court failed to evaluate the Statute as a restriction aimed directly at speech, it erred by applying the four-part test of *United States v. O'Brien*,

391 U.S. 367, 376-77 (1968), which is used to evaluate claims where the impact on First Amendment rights stems from a regulation that is content-neutral. In this Circuit, *O'Brien* and the "time, place and manner" test set forth in *Ward*, 491 U.S. at 792, are essentially identical "tests that apply an intermediate level of scrutiny to content neutral government regulations affecting speech." *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1057 (7th Cir. 2004). But these tests have no application where, as here, the law in question is *not* content-neutral.

Not only did the district court apply the wrong test; it misapplied the test that it selected. In affirming the validity of the state's asserted interest protected by the Statute, the district court ruled that individuals "have the right to be left alone, with such a right to privacy and freedom from harassment being one of the 'most comprehensive of rights and the right most valued by civilized men.'" (A-2 (quoting *Hill v. Colorado*, 530 U.S. 703, 716-18 (2000)). A person on the way into a medical clinic—as in *Hill*—has a much greater right to be left alone than a hunter openly engaging in recreational activities on public land. In fact, it is doubtful that people engaged in hunting, fishing, and trapping under the protections of Wis. Stat. § 29.083 have any right to privacy at all. *See United States v. Oliver*, 466 U.S. 170 (1984) (no expectation of privacy in open fields); *United States v. Knotts*, 460 U.S. 276, 281 (1983) (no expectation of privacy on public roads); *United States v. McIver*, 186 F.3d 1119, 1125 (9th Cir. 1999) (unmanned cameras in U.S. national forests do not intrude on citizens' reasonable expectations of privacy). The district court's analysis gave weight to a

39

privacy interest that should have received no weight at all; this was yet another reversible error.

The district court then ruled—correctly—that "[t]aken alone, regulation of the activities listed in subsection (2)(a)7. a through d. would be overly restrictive." (A-21.) Unfortunately, it immediately undermined this ruling by concluding that the Statute's inclusion of an intent requirement "significantly narrows the scope of the statute and any incidental restrictions on expressive conduct is [sic] minimal and permissible within the 'legitimate sweep' of the statute." (A-22.)

The district court erred in two different ways. First, its reliance on the intent requirement overlooks its own insight that the requirement is subject to widely varying interpretations that could be used to suppress speech. (A-19.) Second, the district court cited *Hill* to support its conclusion that any restrictions on expressive conduct were merely "incidental." *Id*. Once again, the legal and factual issues in *Hill* are too far removed from the legal issues raised on this record for *Hill* to have relevance here. Specifically, *Hill* is unlike this case because the statute in *Hill* was not adopted because of the government's disagreement with the message being presented by "sidewalk counselors." 530 U.S. at 719. In contrast, the Legislature was motivated to enact this Statute principally by animus toward anti-hunting activists. *Hill* is also inapposite because the statute under challenge was a content-neutral regulation. *Id*. at 723-24. Here, because the Statute's declared purpose was to safeguard the citizenry from "armed conflict" resulting from angry hunters' reaction to animal rights

activists (A-21), *Forsyth County* dictates that the Statute be evaluated as a content-based limitation on speech. 505 U.S. at 134.

The record on overbreadth is fully developed; therefore, this Court need not remand for further proceedings, but should declare the Statute unconstitutionally overbroad. Because the intent requirement is no bar to the initiation of government investigations, property seizures, or prosecutions, the Statute should be construed as sweeping broadly to forbid on its face any First Amendment-protected "photographing, videotaping, audiotaping," or otherwise electronically "monitoring or recording" persons engaged in activities covered by Wis. Stat. § 29.083.

The Idaho Supreme Court's analysis in *State v. Casey*, 876 P.2d 138 (Idaho 1994) provides a persuasive illustration of how overbreadth doctrine should be applied to the Statute. *Casey* struck down as overbroad an Idaho statute that criminalized "entering or remaining in any area where any animal may be taken with the intent to interfere with the lawful taking or pursuit of wildlife." *Id*. at 139. The Idaho Court ruled that although the law was content-neutral, it was unconstitutionally overbroad because "the subsection does not require physical interference and it is not limited to prohibiting unprotected speech, such as fighting words or obscenity." *Id*. at 140. There was a "realistic danger that the statute could significantly compromise recognized First Amendment rights" because "someone might enter an area where wildlife could be legally hunted and do nothing more than announce his opposition to hunting and his intention to interfere with such taking. Such a person would

be in violation of subsection (1)(c) and yet his actions constitute protected free speech." *Id.* at 140-41.

The Statute at issue here is even more facially overbroad, given that it explicitly, not implicitly, sweeps in protected First Amendment activity. And like the Idaho statute, the new speech-targeted provisions of Wis. Stat. § 29.083(2)(a)7. do not require physical interference. Even if those provisions received the same "physical interference" limiting construction that saved Wis. Stat § 29.083(2)(a)2 from constitutional infirmity in *State v. Bagley*, 474 N.W.2d 761 (Wis. Ct. App. 1991), the Statute contains no limitations confining it only to specifically forbidden categories of speech such as incitement to imminent lawless action and fighting words. It therefore sweeps into its prohibitions a significant amount of speech that the government is never permitted to regulate. "[N]ew categories of unprotected speech may not be added to the list [of the narrowly-defined unprotected categories] by a legislature that concludes certain speech is too harmful to be tolerated." *Brown*, 564 U.S. at 791. This Court should declare that the Statute is unconstitutionally overbroad and remand with directions to enter a declaratory judgment of unconstitutionality and permanent injunctive relief barring its enforcement.

## V.    The Statute Is Unconstitutionally Vague.

The Statute contains several prohibitions that are so vague they make it effectively impossible for reasonable people to conform their conduct to its requirements, and expose citizens to the risk of discriminatory enforcement decisions. The Statute prohibits intentionally "interfering or attempting to interfere" with specified activities: "maintaining a visual or physical proximity" to a person engaged in hunting

42

activity, Wis. Stat. § 29.083(2)(a)7.a.; "approaching or confronting" such a person, Wis. Stat. § 29.083(2)(a)7.b; and "photographing, videotaping, audiotaping [such a person] . . . regardless of where the act occurs." Wis. Stat. § 29.083(2)(a)7.c. The Statute does not define any of these terms, leaving all those subject to the law to guess at the terms' meaning.

Vague laws pose significant threats to First Amendment rights. First, a content-based regulation that is also vague "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871-72 (1997). Second, a vague law imposing criminal penalties "may cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Id.*

The district court ruled that the intent requirement obviated any concern that people of ordinary intelligence would be unable to understand what the Statute prohibited. (A-22-23.) This ignores the Court's own conclusion that people trying to avoid engaging in conduct criminalized by the statute have legitimate concerns that their behavior "could be interpreted differently by a law enforcement or private citizen as *intended* to interfere with hunting rights." (A-18-19; emphasis in original.) Moreover, it ignores the State's guidance memorandum that explicitly acknowledges that satisfying the intent requirement "may be difficult in application." (D-26 at 4.) The intent requirement fails to rescue the Statute's broad, undefined terms.

The district court's reliance on *Hill v. Colorado* to sustain the statute against Plaintiffs' vagueness challenge fails because the statute upheld in *Hill* was far more

precise than the Statute. The law at issue in *Hill* prohibited all displays of signs, leafletting, and oral speech that took place within (1) 100 feet of a health care facility and (2) within eight feet of a person entering or leaving that facility. The Supreme Court sustained these restrictions against a vagueness challenge, finding that they were sufficiently specific to be understood and obeyed. 530 U.S. at 729-30. In contrast, the Statute contains no distance limitations whatsoever. In fact, it does the opposite of imposing a distance restriction, prohibiting photographing, videotaping, or audiotaping "regardless of where the act occurs." Wis. Stat. § 29.083(2)(a)7.c. The precisely-defined limitations upheld in *Hill* fail to save the literally limitless undefined scope of the Statute.

Finally, the district court gave two flawed reasons why there was no serious risk of arbitrary or discriminatory law enforcement action. First, it stated that "the law requires that a warden personally observe or have reasonable grounds to believe that the law has been or is likely to be violated before issuing an order." (A-23.) This appears to be a reference to Wis. Stat. § 29.083(2)(b), which is an entirely different section of the statute imposing the personal-observation or reasonable-belief requirements on a provision that forbids any person to "knowingly fail to obey the order of a warden or other law enforcement officer to desist from conduct in violation of par. (a)[.]" It is not an additional element of criminal liability under Wis. Stat. § 29.083(2)(a), but an independent and distinct violation that rests on a person's disobeying an order issued by a law enforcement officer. Because it is not a part of the proof required to show a violation of the substantive prohibitions imposed by

§ 29.083(2)(a), the personal-observation and reasonable-belief provisions do not save the Statute from its vagueness deficiencies.

Second, the court ruled that judicial construction would prevent law enforcement or private citizens from unfairly taking advantage of any vagueness in the statute. (A-23.) It cited no law to support this assertion. We could find no authority authorizing the Legislature to delegate its duty to enact laws sufficiently precise to permit behavior conforming to them to the courts that will have to enforce those laws. In any event, the district court is not permitted to improvise a "limiting construction" by engrafting a requirement from one part of a law into a different and unrelated part.

## **CONCLUSION**

For the reasons stated in this brief, this Court should reverse the district court and find the Plaintiffs have standing to challenge the constitutionality of Wis. Stat. § 29.083(2)(a)7., hold the statute to be unconstitutional under strict scrutiny, hold that the statute is unconstitutional under the overbreadth doctrine and is void for vagueness, and remand for the entry of a declaratory judgment and permanent injunctive relief barring enforcement of the statute.

Respectfully submitted this 26th day of February, 2021.

By:   *s/ Joseph S. Goode*

**LAFFEY, LEITNER & GOODE LLC**
Joseph S. Goode
Joseph S. Goode
Jessica L. Farley
325 E. Chicago Street
Suite 200
Milwaukee, WI 53202
(414) 312-7003 Phone
(414) 755-7089 Facsimile
jgoode@llgmke.com
mleitner@llgmke.com
jfarley@llgmke.com

**ANIMAL LEGAL DEFENSE FUND**
Christopher Berry
Kelsey Eberly
Animal Legal Defense Fund
525 E. Cotati Ave.
Cotati, CA 94931
(707) 795-2533
cberry@aldf.org
keberly@aldf.org

*Attorneys for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,091 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) as verified through Microsoft Word's "Word Count" function.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 12-point Century Schoolbook font.

Dated:  February 26, 2021

*s/ Joseph S. Goode*
Joseph S. Goode

*One of the Attorneys for Plaintiffs-Appellants*

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the Appendix.

*s/ Joseph S. Goode*
Joseph S. Goode

**CERTIFICATE OF SERVICE**

I hereby certify that on February 26, 2021, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF No. system. Participants in this case who are registered CM/ECF No. users will be served by the CM/ECF No. system.

*s/ Joseph S. Goode*
Joseph S. Goode

# APPENDIX

**TABLE OF CONTENTS TO APPENDIX**

Opinion and Order, Doc. 59, filed 12/10/20...................................................................... A-1

Judgment, Doc. 60, filed 12/10/20 ...................................................................... A-24

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JOSEPH BROWN, LOUIS WEISBERG,
and STEPHANIE LOSSE,

                      Plaintiffs,

     v.

JEFFREY L. KEMP, CHARLES SIMONO,
MARK FRUEHAUF, ANGELINE E. WINTON,
KIMBERLY LAWTON, KELLY McKNIGHT,
MARTHA MILANOWSKI, WILLIAM NORINE,
ANGELA L. BERANEK, BRUCE R. POQUETTE,
MATTHEW TINGSTAD, MICHAEL NIESKES,
SCOTT K. WALKER, BRAD D. SCHIMEL,
CATHY L. STEPP and TODD A. SCHALLER, all
sued in their official capacities,

                      Defendants.

OPINION AND ORDER

17-cv-549-wmc

      Plaintiffs Joseph Brown, Louis Weisberg, and Stephanie Losse challenge the constitutionality of an amendment to Wisconsin Statute § 29.083, which prohibits a person from interfering with or attempting to interfere with "activity associated with lawful hunting, fishing or trapping." More specifically, plaintiffs claim that after being amended in 2015 to include two or more acts of maintaining a "visual proximity" to, "approaching," or creating visual or audio of someone engaged in those activities, this prohibition is now overbroad, vague and chills lawful expression in violation of the First Amendment. Before the court are the parties' cross motions for summary judgment. (Defs.' Mot. (dkt. #19); Pls.' Mot. (dkt. #30).) For the reasons that follow, the court will grant defendants' motion for summary judgment, finding that: (1) plaintiffs lack standing to bring an as-applied challenge; and (2) plaintiffs' facial challenges fail as a matter of law.

A-1

UNDISPUTED FACTS[1]

**A. The Parties**

Plaintiffs Joseph Brown, Louis Weisberg and Stephanie Losse are Wisconsin residents who have monitored and wish to continue monitoring Wisconsin hunting activity through visual observation, as well as photographic and video documentation. Moreover, plaintiffs plan to use information and imagery gathered in this way to educate the public about the nature of hunting in Wisconsin, particularly wolf hunting.

Plaintiff Joseph Brown is an Assistant Professor at Marquette University in Milwaukee, Wisconsin, who creates documentary films, including films that discuss the pros and cons of Wisconsin wolf hunting. Some of Brown's work is done in affiliation with "Wolf Patrol," an organization that seeks to monitor compliance with hunting and trapping laws and to document hunting activity for public dissemination. Plaintiff Louis Weisberg is the Publisher and Editor-in-Chief of the *Wisconsin Gazette*, a newspaper based in Milwaukee. Through his work at the *Gazette*, Mr. Weisberg has published articles about hunting in Wisconsin, as well as advocated on behalf of the wolf population. To gather information for his publications, Weisberg sends individuals to hunting grounds to observe and take photographs. Finally, plaintiff Stephanie Losse is an environmental and animal rights advocate who volunteers with Wolf Patrol.

Defendants are or were employees of the state of Wisconsin, all sued in their official capacity, including District Attorneys Jeffrey L. Kemp (Polk County), Charles Simono

---

[1] Unless otherwise noted, the court finds the following facts material and undisputed.

2

A-2

(Forest County), Mark Fruehauf (Douglas County), Angeline E. Winton (Washburn County), Kimberly Lawton (Bayfield County), Kelly McKnight (Ashland County), Martha Milanowski (Vilas County), William Norine (Burnett County), Angela L. Beranek (Barron County), Bruce R. Poquette (Sawyer County), Matthew Tingstad (Iron County), and Michael E. Nieskes (St. Croix County).  The other defendants are former Wisconsin officials:  then Governor Scott K. Walker, then Attorney General Brad D. Schimel, then Wisconsin Department of Natural Resources ("DNR") Secretary Cathy L. Stepp and then DNR Chief Warden Todd A. Schaller.

### B.  Statutory History

In 1990, the Wisconsin legislature enacted Wisconsin Statute § 29.223 (1989-90) (later renumbered as § 29.083) in response to ongoing conflicts between non-tribal individuals attempting to prevent members of the Chippewa tribes of Wisconsin from exercising their treaty rights to hunt and fish.  (Defs.' PFOFs (dkt. #21) ¶¶ 28-30.)  This so-called "hunter harassment law" was intended to enable wardens to deal more effectively with interference in lawful hunting or fishing activities.  (*Id*. ¶¶ 31-32.)  The original hunter harassment law prohibited interference or attempted interference in "lawful hunting, fishing or trapping with the intent to prevent the taking of a wild animal" by directly harassing animals, impeding or obstructing persons engaged in lawful hunting, fishing, or trapping (or associated activities), or disturbing property of persons engaged in the same. 1989 Wisconsin Act 190 (1990); Wis. Stat. § 29.223(2)(a).  The law created fines for violations, but in addition to enforcement by DNR and other law enforcement officials, the statute provided a civil action for injunctive relief and/or damages by a "person who is

A-3

adversely affected by, or who reasonably may be expected to be adversely affected by conduct that in violation of sub. (2)(a)." 1989 Wisconsin Act 190 (1990); Wis. Stat. § 29.223(4)(a); Wis. Stat. § 29.99(11r)(a).

In 1991, the state cited three individuals for interfering with Chippewa tribal members' spearfishing. (Defs.' PFOFs (dkt. #21) ¶ 36.) In that case, *State v. Bagley*, 164 Wis. 2d 255, 474 N.W.2d 761 (Ct. App. 1991), the Wisconsin Court of Appeals rejected the Bagley party's claim that the hunter harassment law was unconstitutionally overbroad and vague. The court construed the words "interfere," "obstruct" and "impede" to mean that the statute was limited to physical interference; it further held that this construction, along with the affirmative defense of free speech, prevented the statute from reaching protected speech. *Bagley*, 164 Wis. 2d at 263-65. The court also held that the statute was not unconstitutionally vague because the defendants had notice of the prohibited conduct. *Id*. at 265-66. Finally, the court explained that although what constituted preparatory acts could not be precisely defined, it presented a question of fact because of the great variety of acts that can be involved in preparation for hunting or fishing, "depending on the type or manner of hunting or fishing involved." *Id*. at 267.

Since *Bagley*, the law has been applied regularly to conflicts between hunters, between landowners and hunters, and between landowners and fisherman. (Defs.' PFOFs (dkt. #21) ¶ 42.) Common examples of interactions include individuals or groups "actively trying to prevent another individual or group from taking game or fish," landowners "honking car horns, throwing rocks, or discharging firearms to prevent the taking of fish or game, or to dissuade" people from hunting or fishing in the area, and non-hunters

destroying "lawfully placed bait." (*Id.* ¶¶ 43-46.)

After the state began permitting limited wolf hunting in 2012, advocates against that hunting began "monitoring" hunters, including photographing, filming, and following hunters, and blocking trails. On at least one occasion, wolf hunters were followed home and photographs of their vehicles and license plates were posted online, resulting in threats to the hunters and their property. (*Id.* ¶¶ 63-71.) These activities resulted in increased confrontations between wolf hunters and "monitors," as well as calls to law enforcement asserting violations of the hunter harassment law. (*Id.* ¶¶ 73-75.) During one incident in particular, in July 2015 wolf hunters in Polk County called the Sheriff's Department to report that plaintiff Losse and other individuals associated with the Wolf Patrol were harassing hunters by filming and videotaping them. (*Id.* ¶ 77.) The Sheriff's Department informed the Wolf Patrol that they would be cited for their conduct, although no individuals were ever actually cited or prosecuted related to the incident. (*Id.* ¶¶ 78-80.)

In October 2015, the Wisconsin Legislature began reviewing proposed amendments to bolster the hunter harassment law.[2] (*Id.* ¶ 82.) Modeled after an anti-stalking statute, the main provision to be added (subsection 29.083(2)(a)7) prohibited "engaging in a series of 2 or more acts . . . that are intended to impede or obstruct a person who is engaged in

---

[2] Plaintiffs highlight comments by legislators such as Representative Adam Jarchow. (Compl. (dkt. #1) ¶¶ 111-13 ("With all the unnecessary ruckus [caused by groups like Wolf Patrol], an entire day of hunting could be ruined by people that just don't believe in what someone else is legally doing"; and "If people would respect others' rights, [this legislation] wouldn't have to be [written]. However, there is a group of extremist anti-hunters out there who seem to enjoy making hunters' lives miserable.").) As proof that the law is not content and viewpoint neutral, plaintiffs rely on the timing of the amendment relative to the Polk County incident. (*Id.* ¶¶ 114, 116-17.) However, the comments by Rep. Jarchow and others are not enough to support their claim for the reasons discussed below.

5

lawful hunting, fishing, or trapping, or an activity associated with lawful hunting, fishing,

or trapping." (*Id*. ¶ 84.)  The specific prohibited acts include:

> a.  Maintaining a visual or physical proximity to the person.
>
> b.  Approaching or confronting the person.
>
> c.  Photographing, videotaping, audiotaping, or through other electronic means, monitoring or recording the activities of the person.  This subd. 7.c. applies regardless of where the act occurs.
>
> d.  Causing a person to engage in any of the acts described in subd. 7.a. to c.

(*Id*.)  The amendment further expanded the definition of "activity associated with lawful

hunting, fishing, or trapping" to include "scouting, target shooting, dog training, animal

baiting or feeding."  2015 Wisconsin Act 346, Section 1 (2016).  Finally, the amended

prohibitions include using a drone for the activities listed in 7.a. to c.  (*Id*.)  To address

concerns that the proposed amendment may prohibit activities *not* intended to interfere

with hunting activity, the Legislature also added a requirement of intent.  (*Id*. ¶¶ 85-89.)

Both the original and amended versions of § 29.083 also contain the following

affirmative defense:

> **(3m) Affirmative defense.** It is an affirmative defense to the prosecution for violation of this section if the defendant's conduct is protected by his or her right to freedom of speech under the constitution of this state or of the United States.

Wis. Stat. § 29.083(3m).  The amendment ultimately passed and became effective on April

4, 2016.

A-6

### C. Plaintiffs' Alleged Injury

As the publisher of the *Wisconsin Gazette*, plaintiff Weisberg avers that he fears sending journalists into the field because the statute makes it a crime to "caus[e] a person to engage in any of the acts described [in the statute]." (Weisberg Decl. (dkt. #35) ¶ 3 (citing Wis. Stat. § 29.083(2)(7.d)). Plaintiff Losse further avers that she was stopped by hunters on public grounds, who accused her of harassment in violation of Wisconsin law. Similarly, some hunters called law enforcement to the scene, who also advised that she was violating a Wisconsin statute and would receive a citation, although she was never actually issued one. Finally, plaintiff Brown is currently working on a feature film, which he intends to screen on the film festival circuit when finished. To date, he has amassed over 300 hours of documentary footage of wolf, coyote, bear, and bobcat hunting activities in Northern Wisconsin, but Brown avers that while he wishes to continue these activities, he has refrained from doing so for fear of civil and criminal liability under the Statute.

While filming with the Wolf Patrol from some distance away, Brown specifically represents that hunters have become irate and approached his crew, demanding that they turn over the footage. One hunter, presumably alluding to § 29.083, even told Professor Brown that "You cannot legally videotape a hunt in Wisconsin." (Brown Decl. (dkt. #33) ¶ 8.) While filming and monitoring hunting activity, Brown and Losse both further represent that they have been surrounded by groups of hunters who used their vehicles to prevent them from passing through on a public road, waiting for law enforcement to arrive. On one occasion, a responding local law enforcement officer -- *not* a state employee, and even more specifically, not a DNR employee charged with enforcing § 29.083 -- questioned

7

A-7

Brown and Wolf Patrol volunteers for over an hour.  On another occasion, on January 27, 2018, hunters confronted Brown and other Wolf Patrol volunteers on a public road, barricaded them with their trucks, berated them, and threatened to beat them up and to run them over.  When officers from the Forest County Sheriff's Department arrived, the officers also seized Brown's camera equipment and all his stored footage, including three professional video cameras, a digital camera, his cellphone and two SD cards, and searched these items.  A search warrant, issued twelve days later by a state circuit court judge, even cited a possible violation of § 29.093 as grounds for the search and seizure of Brown's equipment and footage.

While his equipment has since been returned, Brown represents that he has yet to receive his memory cards, although Forest County District Attorney Charles J. Simono avers that his office (1) provided copies of the materials stored on the media cards to Brown at the request of his attorneys and (2) advised the Sheriff's Department that it could release the original evidence to Brown after a decision was made not to prosecute him.  (Simono Decl. (dkt. #42) ¶¶ 9-11.)  Brown further avers that the "specter of potential criminal prosecution continues to hang over his head" (Brown Decl. (dkt. #3) ¶ 5), albeit not with respect to the January 2018 event since, as defendants point out, D.A. Simono made the decision not to prosecute Brown by August 2018.  (*Id.* ¶ 11.)  Indeed, to date, no plaintiff has been arrested, cited, prosecuted or convicted under Wis. Stat. § 29.083 as amended in April 2016; nor are plaintiffs aware of any other individual who has been arrested, cited, prosecuted or convicted under the amended statute.  In response to hunters seeking to have law enforcement officers enforce the statute, as well as concerns raised by Wolf Patrol

members as to whether their filming or photographing hunters would violate the statute, DNR officials have further informed both groups that simply filming or photographing hunters would not violate the statute.  Still, both Losse and Brown represent that they have self-regulated their First Amendment activities for fear of civil or criminal liability under the amended statute.

Finally, on June 20, 2017, DNR officials met with District Attorneys and federal and state law enforcement officers in Bayfield County to address the Wolf Patrol's concerns.  The meeting attendees reviewed videos taken by Wolf Patrol members displaying their interactions with hunters.  Those in attendance agreed that the conduct of Wolf Patrol members in the videos did not constitute interference with hunting, fishing, or trapping, and, therefore, did not violate § 29.083.  Following the meeting, Wolf Patrol's founder Rob Cornado, who attended the meeting, stated in a video message that:  "Our concerns were answered.  We got confirmation from all three agencies present that what they've seen Wolf Patrol do is not illegal."  (Defs.' PFOFs (dkt. #21) ¶ 103.)  DNR guidance further confirms that there must be intent to interfere.

OPINION

The parties filed cross motions for summary judgment with respect to plaintiffs' three issues on standing to bring an as-applied challenge.  The parties have also briefed three facial challenges to § 29.083 regarding:  (a) the role of the section's First Amendment affirmative defense; (b) facial overbreadth; and (c) vagueness.  The court will address each of these issues in turn.

## I.  Plaintiffs' Standing to Assert an As-Applied Challenge

The "irreducible constitutional minimum" of Article III standing requires the party

invoking federal jurisdiction to bear the burden of establishing three elements:

> First, the plaintiff must have suffered an injury-in-fact—an
> invasion of a legally protected interest which is (a) concrete
> and particularized and (b) actual or imminent, not conjectural
> or hypothetical.  Second, there must be a causal connection
> between the injury and the conduct complained of—the injury
> has to be "fairly trace[able] to the challenged action of the
> defendant, and not the result of the independent action of
> some third party not before the court."  Third, it must be
> "likely," as opposed to merely "speculative," that the injury will
> be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  "The party invoking federal

jurisdiction bears the burden of establishing standing."  *Susan B. Anthony List v. Driehaus*,

573 U.S. 149, 158 (2014).

Defendants argue that plaintiffs are unable to establish the first requirement for

standing -- the injury-in-fact -- given that § 29.083 has never been enforced against them.

As the United States Supreme Court acknowledged in *Susan B. Anthony List*, however, the

U.S. Constitution permits "pre-enforcement review under circumstances that render the

threatened enforcement sufficiently imminent."  *Id.* at 159.  Still, in such circumstances,

the Court has required a plaintiff to demonstrate at least "'[1] an intention to engage in a

course of conduct arguably affected with a constitutional interest, [2] proscribed by a

statute, and [3] there exists a credible threat of prosecution thereunder.'"  *Id.* (quoting

*Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

As for the first of these pre-enforcement, standing requirements, plaintiffs have

sufficiently demonstrated their intent to engage in filmmaking, photographing and

A-10

newspaper reporting of hunting, in particular, wolf hunting.  Furthermore, "[t]he act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."). (*See also* Defs.' Reply (dkt. #50) (acknowledging that plaintiffs' filming and photography are covered by the First Amendment).)  However, plaintiffs' ability to demonstrate standing falters at the second and third requirements for pre-enforcement standing.  Specifically, plaintiffs have not put forth evidence to demonstrate that their conduct is "'arguably . . . proscribed by [the] statute' they wish to challenge," nor that the "threat of future enforcement . . . is substantial."  *Susan B. Anthony List*, 573 U.S. at 162, 164.  A brief review of cases where the Supreme Court and the Seventh Circuit have found standing to bring pre-enforcement challenges illustrates what is lacking in the record before this court.

For example, in *Susan B. Anthony List*, the Supreme Court considered whether a "pro-life advocacy organization" had standing to bring a pre-enforcement challenge to an Ohio statute that prohibits "certain 'false statement[s]' 'during the course of any campaign for nomination or election to public office or office of a political party.'"  573 U.S. at 152, 153.  In finding that plaintiff's intended conduct was "arguably . . . proscribed by [the] statute," the Court relied on the fact that:  (1) an Ohio Election Commission panel had already found probable cause to believe that the plaintiff violated the statute in accusing a

11

A-11

congressional candidate of supporting "taxpayer-funded abortion" by supporting the Affordable Care Act; and (2) the organization intended to make similar statements about other candidates in the future. *Id.* at 162. Moreover, to bolster its conclusion that the risk of enforcement was "substantial," the Court emphasized that the plaintiff had already been the subject of a complaint (even though it was later dismissed), explaining "that past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" *Id.* at 164 (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).

Similarly, in *Steffel v. Thompson*, 415 U.S. 452 (1974), the Supreme Court considered whether the plaintiff had standing to challenge a Georgia criminal trespass law, where he had already been threatened by the police with arrest for distributing anti-Vietnam War handbills on the exterior sidewalk of a Georgia shopping center. In finding that the plaintiff had standing to bring a pre-enforcement challenge, the Court relied on this express threat and the fact that the plaintiff's companion, who remained after being threatened with arrest, had actually been arrested and arraigned on a charge of criminal trespass. Finally, the parties in suit stipulated that if the plaintiff "returned and refused upon request to stop handbilling, a warrant would be sworn out and he might [also] be arrested and charged with a violation of the Georgia statute." *Id.* at 456-57, 459.

Likewise, in *Babbit v. United Farm Workers National Union*, 442 U.S. 289 (1979), the Court concluded that a farmworkers' union, its agent, a union supporter, and farmworkers themselves had standing to challenge certain restrictions on consumer publicity in the Arizona Agricultural Employment Relations Act, in part based on the fact that the union planned on engaging consumers in its protests and "the State has not disavowed any

intention of invoking the criminal penalty provision against unions that commit unfair labor practices." *Id.* at 302. In contrast, the Court concluded that plaintiffs *lacked* standing to challenge an "access provision" of the statute, because it was wholly "conjectural to anticipate that access will be denied," since it could "only hypothesize that such an event will come to pass, and it is only on this basis that the constitutional claim could be adjudicated at this time." *Id.* at 303-04.

More recently, in *Center for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012), the Seventh Circuit found a nonprofit organization had standing to raise a pre-enforcement challenge to an Illinois campaign finance disclosure requirement based on its "objectively well-founded" fear of prosecution. Specifically, the court emphasized that the Illinois Attorney General and members of the Board of Elections have "not denied that the Center's past out-of-state 'issue ads' could qualify as electioneering communications under the Illinois disclosure laws," and "there is a sufficiently realistic possibility that the [organization] would be subject to Article 9's registration and reporting requirements if it engaged in the type of political advocacy it often does and wishes to in Illinois." *Id.* at 474-75. In so holding, the Seventh Circuit contrasted the case with an earlier Seventh Circuit decision from 1998, in which it held that Wisconsin Right to Life, Inc., lacked standing to pursue a pre-enforcement challenge to Wisconsin's political committee registration requirements. *See Wisconsin Right to Life, Inc. v. Paradise,* 138 F.3d 1183 (7th Cir. 1998)

In this case, the facts align more closely to the speculative enforcement of the access provision before the Supreme Court in *Babbit* and the registration requirement before the Seventh Circuit in *Wisconsin Right to Life* than to the other examples discussed above in

which both courts found affirmatively expressions of defendant's intent to enforce or refusal to disavow enforcement and substantial likelihood of the plaintiff committing the prohibited act. In holding that the plaintiffs lacked a sufficiently well-founded fear of being subject to the registration regulation in particular, the Seventh Circuit relied on successive advisory opinions issued by the Wisconsin Attorney General and regulations promulgated by the state election board that had already clarified the scope of the statute's application by establishing that the definition of "political committee" did *not* apply to groups like the plaintiff. *Id.* at 1185. The court acknowledged that plaintiff may have "genuine apprehension about what lies ahead," but characterized the lawsuit as an attempt "to resolve a controversy that has not yet arisen and may never arise." *Id.* at 1187-88. So, too, in *Babbit*, the Supreme Court was presented with no evidence that the plaintiff would be denied access, nor even that Arizona refused to say either way.

Here, DNR officials, District Attorneys *and* both federal and state law enforcement agreed the conduct that produced the Wolf Patrol videos did *not* constitute interference with hunting, fishing, or trapping and, therefore, did not violate § 29.083. Moreover, following his participation in a public meeting to address all sides' concerns, Wolf Patrol's founder Rob Cornado stated in a video message that: "Our concerns were answered. We got confirmation from all three agencies present that what they've seen Wolf Patrol do is not illegal." (Defs.' PFOFs (dkt. #21) ¶ 103.) Finally, subsequent DNR guidance *confirmed* that there must be an actual intent to interfere in hunting, fishing and trapping order to violate the statute, and plaintiffs have never indicated in word or action that they have such an intent. Rather, their expressed intent is to *document* those very activities.

14

A-14

Still, plaintiffs persist that the government assurances of non-enforcement do not defeat their standing, even in the face of contrary legal authority. Indeed, even the cases plaintiffs argue support their standing are distinguishable because the statutes expressly prohibited plaintiff's conduct at issue and the threat of prosecution was, at the very least, "latent in the existence of the statute." *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003); *see also Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1168 (9th Cir. 2018) (direct threat of prosecution not required where statute expressly covered the subject conduct and "the threat is latent in the existence of the statute"); *United States v. Stevens*, 559 U.S. 460, 480 (2010) (refusing to "uphold an unconstitutional statute merely because the Government promise[s] to use it responsibly" where conviction for displaying dogfighting clearly fell within the depiction of "wound[ing]" prohibited by the statutes); *Hatchett v. Barland*, 816 F. Supp. 2d 583, 592 (E.D. Wis. 2011) (relying in part of the threat to prosecution being "latent in the existence of the statute" to find plaintiff's claim not moot).[3] In contrast, as discussed above, plaintiffs' conduct here is neither expressly covered by the statute nor is the threat of prosecution latent in the statute. In particular, plaintiffs have failed to direct the court to a clear, or even arguable, indication that their conduct of filming, photographing or observing hunting violates the statute without proof of their intent to interfere with activity associated with lawful hunting, fishing or trapping.

In finding that plaintiffs lack standing to bring an as applied challenge, the court

---

[3] Similarly, in *Animal Legal Defense Fund v. Kelly*, No. 18-2657-KHV (D. Kan. Jan. 22, 2020), the court relied on finding that the intended conduct violated the express terms of the statute in concluding that the plaintiffs had standing to bring a pre-enforcement challenge to *some* of the provisions of the Kansas Farm Animal and Field Crop and Research Facilities Protect Act. (*See* dkt. #58-1 (submitted by plaintiffs as supplemental authority).)

A-15

also agrees with defendants' assertion that this effectively closes the door to any content

or viewpoint-based challenges.  In response, plaintiffs argue that a facial challenge should

still be allowed "when there is alleged unconstrained authority."  (Pls.' Opp'n (dkt. #44)

16.)  Unfortunately for plaintiffs, however, the cases cited in support all involve "licensing

schemes that 'ves[t] unbridled discretion in a government official over whether to permit

or deny expressive activity.'"  *Ward v. Rock Against Racism*, 491 U.S. 781, 793 (1989)

(quoting *Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755 (1988)).[4]  As the

Seventh Circuit explained in *Southworth v. Board of Regents of University of Wisconsin System*,

307 F.3d 566 (7th Cir. 2002), a case in which the court extended the "unbridled discretion

standard of permit and licensing cases" to a mandatory fee system, facial challenges are

warranted in this narrow context because of unique "risks to free expression—the risk of

self-censorship and the risk that the licensing official, not limited by express standards, will

use his power to suppress speech."  *Id.* at 576, 580 (discussing *Lakewood*, 486 U.S. at 575-

58). Here, other than citing these cases, plaintiffs have failed to develop any argument

explaining (nor can this court discern) how this case falls within the "unbridled discretion"

line of cases in which courts have defined a narrow basis to assert a facial content or

viewpoint-based challenged.

---

[4] Plaintiff also cites to *Cox v. State of Louisiana*, 379 U.S. 536 (1965), but this was an appeal of a
criminal conviction, and it contains no discussion of whether a facial challenge would be appropriate
based on content or viewpoint challenges.  Plaintiffs' citation to *Perry Education Association v. Perry
Local Educators' Association*, 460 U.S. 37 (1983), is equally confusing, since that opinion has *no*
mention of a facial challenge, and in fact, the union in that case challenged the bargaining agreement
after suffering an actual injury by being excluded from the school district's intraschool mailing
system.

A-16

## II. Other Facial Challenges

The court's holding that plaintiffs lack standing to bring an as-applied challenge does not necessarily close the door to *all* facial challenges. In particular, plaintiffs may assert facial challenges on vagueness and overbreadth grounds. *See Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012) (recognizing facial challenges to vague or overbroad statutes having a "substantial effect on constitutionally protected activity"). Before turning to those two challenges, the court will address defendant's argument that the Statute's First Amendment "affirmative defense" provision insulates it from such a challenges.

### A. First Amendment Affirmative Defense

As explained above, subsection 3m of the Hunter Harassment Act states:

> It is an affirmative defense to the prosecution for violation of this section if the defendant's conduct is protected by his or her right to freedom of speech under the constitution of this state or of the United States.

Wis. Stat. § 29.083(3m). Defendants point to the Wisconsin Court of Appeals' reliance on this provision in upholding the constitutionality of the Act in *Bagley*. Moreover, given that the Wisconsin Legislature did not amend the provision in 2016 in light of the holding in *Bagley*, defendants further argue that the "legislature clearly intended to exclude protected speech from the strictures of this statute," also remains intact. (Defs.' Opening Br. (dkt. #20) 14 (quoting *Bagley*, 164 Wis. 2d at 263-64).) Whether true or not, not even the *Bagley* decision held that the affirmative defense saved § 29.083 from all First Amendment challenges; rather, the court relied on the language of subsection 3m to bolster

17

A-17

its interpretation of the portions of the Act challenged in that case.  Regardless, the court

agrees with plaintiffs that the affirmative defense provision does not relieve the Act from

judicial review under the First Amendment, for much the same reason that the Seventh

Circuit relied on in rejecting a similar argument in *Hodgkins ex rel. Hodgkins v. Peterson*, 355

F.3d 1048 (7th Cir. 2004).

     In *Hodgkins*, the plaintiffs challenged the constitutionality of Indiana's nighttime

juvenile curfew law that made it illegal for minors to be out in public after certain times.

Defendants argued that the curfew law was constitutional because it contained an

affirmative defense for minors arrested while participating in, going to, or returning from

an activity protected under the First Amendment.  *Id.* at 1051.  Ultimately, the Seventh

Circuit rejected that argument, reasoning that:

> [B]ecause the defense imposes no duty of investigation on the
> arresting officer, as a practical matter it protects only those
> minors whom the officer has actually seen participating in
> protected activity.  This strikes us as a small subset of minors
> participating in late-night First Amendment activities, and
> therefore we conclude that the statute reaches a substantial
> amount of protected conduct. . . .  The statute restricts a
> minor's access to any public forum during curfew hours, and
> the affirmative defense for participating in First Amendment
> activities does not significantly reduce the chance that a minor
> might be arrested for exercising his First Amendment rights.
> Under these circumstances, a facial challenge is both
> appropriate and necessary.

*Id.* at 1062, 1064.

     Admittedly, the affirmative defense here is different in that the conduct at issue *is*

First Amendment speech (observing, recording, reporting on hunting or fishing activities),

but it is not exclusively that, or at least has not eliminated conduct that could be

interpreted differently by a law enforcement or private citizen as *intended* to interfere with hunting rights. So, even if the affirmative defense under subsection 3m may *reduce* the risk that individuals participating in the First Amendment activities would be subject to arrest or suit, prosecution or the time and expense of having to mount a defense, it does not preclude examination for overbreadth or vagueness. *Id.* at 1056.

### B. Overbreadth

Turning to plaintiffs' two facial challenges, § 29.083 prohibits persons from interfering or attempting "to interfere with lawful hunting, fishing, or trapping with the **intent** to prevent the taking of a wild animal, or intentionally interfere with or intentionally attempt to interfere with" lawful hunting or fishing activity. The statute further delineates prohibited activities that qualify as intentional interference. Wis. Stat. § 29.083(2)(a).

Plaintiffs claim that the law "criminalizes a sweepingly broad . . . set of actions," including "approaching a hunter, photographing or videotaping a hunter, or even 'maintaining a visual or physical proximity' to a hunter." (Compl. (dkt. #1) ¶ 4.) They further claim that the statute has created an "imminent and credible threat of prosecution for engaging in protected conduct," and the statute chills expression, causing them to "refrain from engaging in protected speech." (*Id.* ¶ 6.)

As an initial matter, defendants point out that plaintiffs have not even demonstrated that First Amendment rights are implicated here since the statute only regulates conduct that interferes with the lawful activities of hunters and fishers. (Defs.' Opening Br. (dkt. #20) 28.) However, the court need not decide this issue because the

19

A-19

statute is not unconstitutionally overbroad.

Application of the overbreadth doctrine is "strong medicine." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). As a consequence, courts will not find facial overbreadth if a limiting construction can be applied to the challenged statute and overbreadth claims will be "curtailed when invoked against ordinary criminal laws that are sought to be applied to protected conduct." *Id*. When both conduct and speech are involved, plaintiffs are required to show that "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Hill v. Colorado*, 530 U.S. 703, 731 (2000). In *United States v. O'Brien*, 391 U.S. 367, 376-77 (1968), the Supreme Court laid out a four-factor test to determine whether incidental government limitations on First Amendment activities was justified and permissible: (1) whether the regulation "is within the constitutional power of the Government;" (2) whether it furthers a "substantial government interest;" (3) if that interest is "unrelated to the suppression of free expression;" and (4) if the incidental restriction on freedoms is "no greater than is essential to the furtherance of that interest." *Id*.

As noted, the State of Wisconsin seeks to regulate non-communicative conduct that involves intentionally impeding or obstructing lawful hunting and fishing activities. The potential communicative element may result from conduct by individuals who observe, record or report on hunting and fishing activities. The statute easily meets the first three *O'Brien* requirements. First, a statute restricting activities *intended* to harass or impede individuals conducting lawful hunting or fishing activities is certainly within the state's power. Second, the State has a compelling and substantial interest in minimizing conflict

and protecting law-abiding citizens from harassment.  In fact, the Supreme Court has highlighted that while individuals have the right to attempt to communicate with others, they also have the right to be left alone, with such a right to privacy and freedom from harassment being one of the "most comprehensive of rights and the right most valued by civilized men." *Hill*, 530 U.S. at 716-18.  Third, preventing conflict in the woods, particularly armed conflict, is unrelated to the suppression of free expression.  Defendants also argue that the affirmative defense created in § 29.083(3m) helps insure that the statute's sweep will not include any speech covered by the First Amendment.  (Defs.' Opening Br. (dkt. #20) 14.)  Although an affirmative defense provision is not enough to save a statute from an overbreadth inquiry as the court described above, it does provide guidance as to how it will be interpreted and applied given that the focus is expressly on preventing harassing conduct and *not* on suppressing speech.

The court must then determine whether the incidental restrictions on First Amendment freedoms caused by the statute are not greater than necessary to accomplish its purposes.  Plaintiffs specifically focus on § 29.083(2)(a)2, (2)(a)3, (2)(a)7, and (2)(a)8.  Sections (2)(a)2 and 3 prohibit impeding or obstructing a person engaged in lawful hunting, fishing or trapping, or an activity associated with the same.  Section (2)(a)7 lists a series of activities that, when engaged in over time (two or more acts), show intent to impede or obstruct lawful hunting activities.  Section (2)(a)8 prohibits use of a drone for the same types of activities.  Taken alone, regulation of the activities listed in subsection (2)(a)7.a through d would be overly restrictive.  However, the listed activities, such as approaching a hunter, photographing, etc., are only prohibited when also "intended to

21

A-21

impede or obstruct" another person who is engaged in lawful activities. Defendants correctly point out that such an intent requirement significantly narrows the scope of the statute and any incidental restrictions on expressive conduct as a result is minimal and permissible within the "legitimate sweep" of the statute. *See Hill*, 530 U.S. at 732.

### C. Vagueness

Plaintiffs also argue that the statute is unconstitutionally vague. A statute can be unconstitutionally vague in two ways: "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. As in *Hill*, the requirement of intent addresses the first concern. All activities prohibited by the statute require that the offender *intend* to interfere with the lawful activities of another. Further, courts have never required that statutes be written with perfect clarity or precision, even when they may restrict expressive activity, *United States v. Williams*, 553 U.S. 285, 304 (2008), and "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications,'" *Hill*, 530 U.S. at 733 (quoting *United States. v. Raines*, 362 U.S. 17, 23 (1960)). Although the words "impede" or "obstruct" are not clearly defined within the statute, their ordinary meanings are well understood and can be found in any dictionary. Under *Bagley*, the Wisconsin Court of Appeals has further limited their meaning to physical interference. *Bagley*, 164 Wis. 2d at 263-65.

The word "proximity" is inherently more subjective and, thus, more problematic.

22

A-22

However, it is not merely maintaining a proximity to a person that is prohibited, it is doing so with the intent to physically impede or obstruct the person's lawful activities.  That "narrowing context" and guidance of the so-called First Amendment affirmative defense removes some of the indeterminacy of the word proximity and brings it out of the realm of the purely subjective.  *Williams*, 553 U.S. at 306.

As for the risk of arbitrary and discriminating enforcement, the law requires that a warden personally observe or have reasonable grounds to believe that the law has been or is likely to be violated before issuing an order.  Although it is not ideal to rely on judicial construction to save a statute from unconstitutionality, as so construed, these guidelines do not appear to encourage arbitrary or discriminatory enforcement, and thus are facially valid.  Similarly, with any attempt by private citizens to abuse the right of private action, courts will hopefully again be a brake on such abuse.

## ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #19) is GRANTED.

2) Plaintiffs' motion for summary judgment (dkt. #30) is DENIED.

3) The clerk's office is directed to enter judgment in defendants' favor and close this case.

Entered this 10th day of December, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

23

A-23

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JOSEPH BROWN, LOUIS WEISBERG,
and STEPHANIE LOSSE,

        Plaintiffs,                             Case No.  17-cv-549-wmc

      v.

JEFFREY L. KEMP, CHARLES SIMONO,
MARK FRUEHAUF, ANGELINE E. WINTON,
KIMBERLY LAWTON, KELLY MCKNIGHT,
MARTHA MILANOWSKI, WILLIAM NORINE,
ANGELA L. BERANEK, BRUCE R. POQUETTE,
MATTHEW TINGSTAD, MICHAEL NIESKES,
SCOTT K. WALKER, BRAD D. SCHIMEL,
CATHY L. STEPP, and TODD A. SCHALLER,

        Defendants.

## JUDGMENT IN A CIVIL CASE

      IT IS ORDERED AND ADJUDGED that judgment is entered in favor of

defendants Jeffrey L. Kemp, Charles Simono, Mark Fruehauf, Angeline E. Winton,

Kimberly Lawton, Kelly McKnight, Martha Milanowski, William Norine, Angela L.

Beranek, Bruce R. Poquette, Matthew Tingstad, Michael Nieskes, Scott K. Walker,

Brad D. Schimel, Cathy L. Stepp, and Todd A. Schaller against plaintiffs Joseph

Brown, Louis Weisberg, and Stephanie Losse dismissing this case.


      s/ K. Frederickson, Deputy Clerk           December 10, 2020
      Peter Oppeneer, Clerk of Court              Date

A-24